SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

SHAUNA MCKENZIE-MORRIS and FREEMIND
MUSIC LLC

|  |  |
|---|---|
| Plaintiffs, | Index No. |
| v. | **SUMMONS** |

V.P. RECORDS RETAIL OUTLET, INC., V.P. MUSIC
GROUP, INC., V.P. RECORD DISTRUBTORS, LLC,
VP RECORDS OF BROOKLYN LLC,
GREENSLEEVES PUBLISHING, LTD and STB MUSIC
INC.

Defendants.

------------------------------------------------------------------x

**YOU ARE HEREBY SUMMONED** to appear and answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on Plaintiffs' attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if the summons is not personally delivered to you within the State of New York); and in case of your failure to appear and/or answer, judgment will be taken against you by default for the relief demanded in the complaint hereto attached.

The basis of the venue designated is that one or more of the defendants in the above captioned matter conducts business in this County and/or submits to the venue pursuant to one or more of the agreements relevant to the instant action.

**Defendant's Addresses and/or DOS Entity Process Addresses:**

V.P. RECORDS RETAIL OUTLET, INC.          V.P. MUSIC GROUP, INC.
(DOS ID 1751239)                          (DOS ID 1751244)
89-05 138h Street                         89-05 138h Street
Jamaica, New York 11435                   Jamaica, New York 11435


V.P. RECORD DISTRUBTORS, LLC              VP RECORDS OF BROOKLYN LLC
(DOS ID 4914206)                          (DOS ID 3357732)
89-05 138h Street                         89-05 138h Street
Jamaica, New York 11435                   Jamaica, New York 11435


GREENSLEEVES PUBLISHING, LTD              STB MUSIC INC.
89-05 138h Street                         89-05 138h Street
Jamaica, New York 11435                   Jamaica, New York 11435



DATED:          January 7, 2022

                New York, New York


                                By: _____

                                Miami Entertainment Law Group

                                Celeste N. McCaw, Esq.

                                44 Court Street, Suite 1217

                                Brooklyn, New York 11201

                                Tel: (305) 417-6450

                                *Attorneys for Plaintiff*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

SHAUNA MCKENZIE-MORRIS and FREEMIND
MUSIC LLC

                                            **Plaintiffs,**       Index No.

v.                                                 **COMPLAINT**

V.P. RECORDS RETAIL OUTLET, INC., V.P. MUSIC
GROUP, INC., V.P. RECORD DISTRUBTORS, LLC,
V.P. RECORDS OF BROOKLYN LLC,
GREENSLEEVES PUBLISHING, LTD and STB MUSIC
INC.

                                            **Defendants.**

-------------------------------------------------------------------x

       Plaintiffs Shauna McKenzie-Morris p/k/a Etana ("McKenzie") and Freemind Music LLC

("Freemind") (collectively the "Plaintiffs") by their attorney, Miami Entertainment Law Group,

as and for their Complaint against defendants V.P. Records Retail Outlet, Inc., V.P. Music

Group, Inc., V.P. Record Distributors, LLC, VP Records of Brooklyn LLC (collectively, "VP

Records"), Greensleeves Publishing, Ltd ("GPL"), and STB Music Inc. ("STB") (VP Records,

GPL and STB are collectively referred to herein as "Defendants"), hereby allege as follows:

## I.    NATURE OF THE ACTION

       1.     This action arises because Defendants have fraudulently concealed their true use

and disposition of Plaintiffs' Masters, Albums, Compositions and/or Recordings and have either

failed to render proper accounting statements regarding Plaintiffs' royalties or intentionally

rendered dishonest and grossly deficient accounting statements, all in an effort to pocket millions

of dollars of Plaintiffs' royalties. In so doing, Defendants have shown an utter disregard for their

contractual obligations and have flagrantly abused the more than a decade relationship of trust and confidence placed in them by Plaintiffs.

2.     McKenzie is professionally known as Etana and is a Jamaican reggae and two-time Grammy-nominated recording artist and songwriter.

3.     Since her first commercial release in 2006, McKenzie has sold millions of albums worldwide, including one certified gold song and receiving two awards for topping the Billboard Reggae Charts. She is the first female artist to receive a Grammy nomination in the Reggae album category.

4.     From 2007 up and through 2014, McKenzie, in her individual capacity, entered into a series of contracts with the Defendants wherein Plaintiffs granted the Defendants rights to exploit and/or administer McKenzie's written music, her recording services and her image, name and likeness on and in connection with her musical compositions, albums, and sound recordings (collectively, the "Masters, Albums, Compositions and/or Recordings"), including but not limited to "The Strong One, "Free Expressions," "Better Tomorrow," and "I Rise."

5.     Despite all the commercial success enjoyed by McKenzie, to date, the Defendants have not provided a formal accounting and they have not properly paid Plaintiffs the royalties and other income due to the Plaintiffs under their agreements, including but not limited to artist royalties, mechanical royalties, public performance royalties, profits from the sale of merchandise and/or any licensing fees.

6.     Despite recent demands upon the Defendants for a proper accounting and payment of monies owed to the Plaintiffs, the Defendants have failed to comply.

7.     The Plaintiffs have brought this action seeking payment of all royalties owed to Plaintiffs for the last fourteen (14) years pursuant to their agreements with the Defendants.

8.      Additionally, due to the Defendants' failure to account and comply with the terms of their respective agreements with the Plaintiffs, the Plaintiffs seek an order from the Court which terminates the Defendants rights in connection with the Plaintiffs' Masters, Albums, Compositions and/or Recordings, clarifies the Plaintiffs' ownership rights in their music and which all royalties or income due to McKenzie under her agreements with the Defendants and due to Freemind under the law are to be made through a receiver, administrator, trustee or non-interested third party.

## II.    THE PARTIES

9.      Plaintiff McKenzie is a citizen of the state of Florida who resides in Fort Lauderdale, Florida.

10.     Plaintiff Freemind is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business at 3345 NW 22nd Court, Lauderdale Lakes, Florida 33311. Freemind is operated and controlled by Andre Morris, Justina Lawrence, and McKenzie for the purpose of collecting income in connection with the production share of sound recordings and/or the publisher share of their artists' written compositions.

11.     Upon information and belief, Defendant V.P. Records Retail Outlet, Inc.is a corporation organized and existing under the laws of the State of New York having a principal place of business at 89-05 138th Street, Jamaica, New York 11435.

12.     Upon information and belief, Defendant V.P. Music Group, Inc. is a corporation organized and existing under the laws of the State of New York having a principal place of business at 89-05 138th Street, Jamaica, New York 11435.

3

13.     Upon information and belief, Defendant V.P. Record Distributors, LLC is a limited liability company organized and existing under the laws of the State of New York having a principal place of business at 89-05 138th Street, Jamaica, New York 11435.

14.     Upon information and belief, Defendant VP Records of Brooklyn LLC is a limited liability company organized and existing under the laws of the State of New York having a principal place of business at 89-05 138th Street, Jamaica, New York 11435.

15.     Upon information and belief, Defendant GPL, formerly Greensleeves Records, a British record label dating to 1977, was acquired by VP Records in 2008 and operates under the laws of the State of New York having a principal place of business at 89-05 138th Street, Jamaica, New York 11435.

16.     Upon information and belief, Defendant STB a/k/a "Strictly The Best" was established in 1993 as a publishing arm of VP Records to issue annual reggae compilations and operates under the laws of the State of New York having a principal place of business at 89-05 138th Street, Jamaica, New York 11435.

## III.     JURISDICTION AND VENUE

17.     Each of the Defendants has maintained substantial and continued contact with New York for many years. Upon information and belief, Defendants are authorized to do business, and have done and continue to do business, and have transacted and continue to transact business in the City and State of New York and have committed and continue to commit tortious acts within the State of New York from which business and acts the causes of action set forth herein arise.

18.     Each of the Defendants has committed tortious acts without the State of New York causing injury to the Plaintiffs within the State and each of the Defendants regularly does

4

and solicits business, engages in persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in the State of New York.

19.     Each Defendant expected or reasonably should have expected that their acts would have consequences in the State of New York, and they derive substantial revenue from interstate and international commerce.

20.     VP Records has, under the agreements relevant to the instant action, submitted to the jurisdiction of, and venue in the State and Federal courts located in New York in respect of any matters arising under those agreements.

21.     This Court has personal jurisdiction over Defendants pursuant to New York CPLR §§ 301 and 302.

22.     This Court has subject matter jurisdiction over this action pursuant to N.Y. CONST. art. VI, § 7(a) and N.Y. JUD. LAW § 140-b. The value of Plaintiffs' claim exceeds Twenty-Five Thousand ($25,000.00) Dollars.

23.     Venue is proper in the County of New York pursuant to New York CPLR §§ 501 and 503.

## IV.    FACTS ALLEGED IN SUPPORT OF ALL CAUSES OF ACTION

### A.    MCKENZIE & FREEMIND MUSIC

24.     Freemind is an active legal entity which not only collects the royalties for McKenzie but also publishes and produces music for various artists, including McKenzie.

25.     McKenzie is a recording artist, singer, songwriter, humanitarian, powerhouse vocalist, and Grammy Award nominee.

26.     McKenzie composed and performed a string of international classic reggae releases over the past decade, which continue to be sold, distributed, and capitalized by Defendants to date.

27.     McKenzie is one of Jamaica's most successful and distinctive artists, the instantly recognizable voice behind many of the genre's definitive anthems.

28.     More than a decade after her debut as a reggae artist, McKenzie is now a recognized and respected entertainer in her native country, Jamaica, and is also well known worldwide.

29.     McKenzie had breakthrough hits such as "I Am Not Afraid," "Roots," "Wrong Address," and "Blessing," and modern classics such as "I Rise," "People Talk," "Reggae," "Love Song," and "My Man."

**B. <u>V.P. RECORDS RETAIL OUTLET, V.P. MUSIC GROUP, V.P. RECORD DISTRIBUTORS, VP RECORDS OF BROOKLYN & STB MUSIC</u>**

30.     V.P. Records Retail Outlet, Inc. was founded by Vincent "Randy" Chin and his wife Patricia Chin during the 1970's.

31.     In or around 1993, V.P. Records Retail Outlet, Inc. formed an independent record label, V.P. Music Group, Inc., after the success of its retail store.

32.     Upon information and belief, in or around 2006, V.P. Records Retail Outlet, Inc. formed VP Records of Brooklyn LLC and in or around 2016, V.P. Records Retail Outlet, Inc. formed V.P. Record Distributors LLC in connection with its record label's business operations.

33.     VP Records is known for reggae, dancehall, soca, and reggaeton music.

34.     VP Records releases annual reggae compilations through STB, which feature various artists' tracks using the same rhythm or musical sound recording.

6

35.     McKenzie's written compositions and musical sound recordings have been featured in several volumes of STB's reggae compilations, including but not limited to Vol. 40, Vol. 44, and Vol. 46.

### C.  **GREENSLEEVES PUBLISHING**

36.     Greensleeves Records was a British record label and publishing company dating to 1977 with a catalog that included many recording artists from Jamaica.

37.     VP Records acquired Greensleeves Records in or around 2008 and renamed the entity Greensleeves Publishing, Ltd.

### D.  **VP RECORDING AGREEMENT**

38.     On or about May 1, 2007, McKenzie and VP Records entered into an exclusive Recording Agreement for the delivery of four (4) albums (hereinafter "VP Recording Agreement" or the "First Recording Agreement").

39.     Under the First Recording Agreement, accountings as to royalties accruing or which otherwise would have accrued were to be made by VP Records to McKenzie on or before September 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st, or such other accounting periods as VP Records may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by McKenzie during such preceding half-year, less any advances VP Records had paid to McKenzie and/or bona fide costs/expenses incurred and paid in connection with the Masters, Albums, Compositions and/or Recordings.

40.     Under the First Recording Agreement, McKenzie was entitled to the following royalties:

7

(i)     For the sale of Phonograph Records, thirteen percent (13%) of the
suggested retail list price of all Albums delivered during the Initial Period,
the First Option Period, the Second Option Period, and the Third Option
Period sold by VP Records for distribution through Normal Retail
Channels in the United States and Canada based upon ninety percent
(90%) of the net sales of records embodying Master Recordings hereunder
(Artist's "Basic Rate").

(ii)    For the sale of Phonograph Records, fourteen percent (14%) on USNRC
Net Sales of Albums in excess of two-hundred fifty thousand (250,000)
units and up to and including USNRC Net Sales of such Album which
five-hundred thousand (500,000) units.

(iii)   For the sale of Phonograph Records, fifteen percent (15%) on USNRC Net
Sales of Albums in excess of five-hundred thousand (500,000) units.

(iv)    Nine percent (9%) of the Royalty Base for Net Sales of all Singles sold by
VP Records for distribution through Normal Retail Channels in the United
States and Canada based upon ninety percent (90%) of the net sales of
records embodying Master Recordings.

(v)     Sixty-six and two third percent (66-2/3%) with respect to Net Sales of
Records sold for distribution outside of the United States and Canada,
specifically in Japan, England, France, and Germany, and fifty percent
(50%) with respect to Net Sales of Records sold for distribution in the rest
of the world.

(vi)     Eighty-five percent (85%) with respect to Net Sales of Records sold in the form of compact discs.

(vii)    Seventy-five percent (75%) with respect to Net Sales of Records sold in the form of New Media Records.

(viii)   The royalty for Net Sales of EP Records shall be accrued at one-half (1⁄2) of the nine percent (9%) royalty rate and shall be computed based on the particular Royalty Base of each EP Record.

(ix)     The royalty for any Mid-Price Record shall be accrued at three-quarters (3/4) of the thirteen, fourteen, or fifteen percent (13%, 14%, or 15%) royalty rate for Phonograph Records or at three-quarters (3/4) of the nine percent (9%) royalty rate for Singles and shall be computed on the particular Royalty Base of each such Record.

(x)      The royalty for Net Sales of premium Records, Budget Records, Records sold in Armed Forces Post Exchanges, Multiple-Record Albums, special configuration Singles (i.e., Singles and/or Long-Play Singles sold at two for the price of one, manufactured in colored vinyl and/or sold with a four-color poster included) or Records other than Albums not otherwise specifically referred to herein shall be accrued at one-half (1⁄2) of the thirteen, fourteen, or fifteen percent (13%, 14%, or 15%) royalty rate for Phonograph Records or at one-half (1⁄2) of the nine percent (9%) royalty rate for Singles and shall be computed based on the particular Royalty Base of each such Record.

9

(xi)     With respect to the following Records and/or exploitation of Master

Recordings, the royalty to be accrued hereunder shall be a sum equal to

fifty percent (50%) of VP Records' net receipts with respect to such

exploitation: (i) Records derived from Master Recordings hereunder sold

through Non-Affiliated Third Party record clubs or similar sales plans

operated by Non-Affiliated Third Parties; (ii) licenses of Master

Recordings to Non-Affiliated Third Parties for sales of Records by such

licensees through direct mail, mail order or in conjunction with TV or

radio advertising, including through methods of distribution such as "key

outlet marketing" (distribution through retail fulfilment centers in

conjunction with special advertisements on radio or television), or by any

combination of the methods set forth above or other methods; (iii) licenses

of Master Recordings on a flat-fee or other royalty basis; (iv) licenses to

Non-Affiliated Third Parties for promotional or commercial use of Audio-

Visual Recordings, excluding blanket licenses to exploit VP Records'

Audio-Visual Recording catalog; and (v) use of the Master Recordings for

background music, synchronization in motion pictures and soundtracks

and Records derived therefrom whether or not released by VP Records or

Non-Affiliated Third Parties, and/or use on transportation facilities.

(xii)    As to Net Sales of Records derived from Master Recordings hereunder

sold through VP Records' affiliated record clubs or similar sales plans

operated by parties affiliated with VP Records, McKenzie shall receive a

royalty equal to eighty-five percent (85%) of the Royalty Base of such Records.

(xiii)  As to Net Sales by VP Records or its affiliated licensees of Records derived from Master Recordings by direct mail, mail order or in conjunction with radio or TV advertising, the royalty to be accrued shall be one-half (1/2) of the thirteen, fourteen, or fifteen percent (13%, 14%, or 15%) royalty rate for Phonograph Records or at one-half (1/2) of the nine percent (9%) royalty rate for Singles.

(xiv)  In the event VP Records or any of its affiliated licensees in a particular country utilize television and/or radio advertising in conjunction with a television campaign to promote its sales of Records derived from Master Recordings hereunder, then the royalty to be accrued hereunder with respect to Net Sales of such Records sold by VP Records or the particular affiliated licensee in such country during the semi-annual accounting period in which the first such advertisement is broadcast through the end of the semi-annual accounting period in which the last such advertisement is broadcast shall be fifty percent (50%) of the otherwise applicable royalty rate.

(xv)  If any Recordings embody McKenzie's performances together with the performances of any other Persons to whom VP Records is obligated to pay royalties, then the royalty due for such joint performances shall be the royalty provided for under the agreement divided by the number of royalty-earning artists participating, including McKenzie.

(xvi)    As to Records not consisting entirely of Master Recordings delivered or in the case of the sale of individual Master Recordings via the internet or other similar means, the applicable royalty to be accrued shall be pro-rated on the basis of the number of Master Recordings which are on such Records compared to the total number of Master Recordings on such Records or the Album from which such Master Recordings were originally embodied.

(xvii)    With respect to Net Sales of Audio-Visual Devices sold by VP Records for distribution in the United States and Canada, a royalty of one-half ($1/2$) of the applicable Royalty Base.

(xviii)    With respect to Net Sales of Audio-Visual Devices sold by VP Records and/or its affiliates for distribution outside of the United States and Canada, a royalty of five percent (5%) of the applicable Royalty Base.

(xix)    With respect to Net Sales of Budget Videos the otherwise applicable royalties shall be reduced in the same proportion as Record royalties are reduced for sales of Budget Records.

(xx)    With respect to Net Sales of Records sold by VP Records for distribution in the United States in the form of CD/Videos, a royalty of twelve percent (12%) of the applicable Royalty Base.

(xxi)    With respect to sale of Masters outside the United States through VP Records' licensees, the royalties payable to McKenzie shall be fifty percent (50%) of VP Records' net royalty receipts, without regard to advances in connection therewith (if any).

(xxii)  With respect to Net Sales through Normal Retail Channels in the United States of any so-called greatest hits album ("Greatest Hits Album") released by VP Records under this agreement, the royalty to be accrued shall be calculated on a Master-by-Master basis as follows: the royalty rate ascribed to each Master Recording embodied on such Greatest Hits Album (the "Per Master Rate") shall equal a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of Master Recordings embodied on the Greatest Hits Album, multiplied by the average royalty rate achieved at the time of release of such Greatest Hits Album, by the Album on which such Master Recording was originally embodied, taking into account sales escalations. The royalty rate for such Greatest Hits Album shall equal the average of each Per Master Rate.

(xxiii)  The royalty rate on any Electronic Transmission Record or Mobile Applications (whether sold by VP Records, any third party on VP Records' behalf or its licensees) will be the lesser of eighty percent (80%) of the otherwise applicable thirteen, fourteen, or fifteen percent (13%, 14%, or 15%) royalty rate for Phonograph Records and fifty percent (50%) of VP Records' actual net receipts without regard to advances in connection therewith (if any) solely and identifiably attributable to the exploitation of rights granted under this agreement by Electronic Transmission Record or Mobile Applications (as applicable).

13

41.     On or about June 17, 2008, McKenzie debuted the album, "The Strong One," featuring various musicians and other producers.

42.     "The Strong One" reached the #12 spot on the Reggae Billboard Charts.

43.     The album "Free Expressions" was released on or about December 16, 2010 and made available worldwide by February 8, 2011.

44.     "Free Expressions" peaked at number #11 on the Reggae Billboard Charts.

45.     On or about February 18, 2013, McKenzie's album "Better Tomorrow" was released by VP Records and peaked at #9 on the Reggae Billboard Charts.

46.     On or about October 24, 2014, McKenzie's album "I Rise" was released by VP Records to much acclaim, making it to the #1 spot on the iconic Reggae Billboard Charts and making McKenzie the first female artist from Jamaica to earn such a spot in over seventeen (17) years.

47.     Upon McKenzie's delivery of "I Rise" as the fourth album, the First Recording Agreement between McKenzie and VP Records was concluded.

48.     Upon information and belief, per the terms of the First Recording Agreement, VP Records paid McKenzie an Advance on Royalties that she was to be paid in connection with the exploitation of the Masters, Albums, Compositions and/or Recordings.

49.     Upon information and belief, VP Records and/or their respective successors, affiliates, and assigns, including but not limited to one or more of the Defendants, have continuously sold and commercially exploited the Masters, Albums, Compositions and/or Recordings from the date of their release up and through the date of this Complaint.

50.     Upon information and belief, as of the date of this Complaint, VP Records has fully recouped the Advance paid to McKenzie and all other costs and expenses incurred and paid

by VP Records in connection with the Masters, Albums, Compositions and/or Recordings, if any.

51.     Upon information and belief, all income generated by the commercial exploitation of the Masters, Albums, Compositions and/or Recordings to date was initially collected by and/or paid to VP Records and/or its successors, affiliates, and assigns.

52.     Notwithstanding and despite McKenzie's full performance under the First Recording Agreement, to date, VP Records and/or its successors-in-interest have failed to fully pay McKenzie her Royalties in connection with the commercial exploitation of the Masters, Albums, Compositions and/or Recordings and/or otherwise due under the First Recording Agreement.

## E. **GPL SONGWRITER AGREEMENT**

53.     In or around December 2007, McKenzie entered into a five (5) year Songwriter Agreement with Greensleeves Publishing, Ltd (hereinafter "GPL Songwriter Agreement").

54.     McKenzie was not aware that Greensleeves Publishing Ltd was not a lawfully organized corporate entity at the time of signing the GPL Songwriter Agreement.

55.     Under the GPL Songwriter Agreement, accountings as to royalties accruing or which otherwise would have accrued were to be made by GPL to McKenzie on or before March 31st for the semi-annual period ending the preceding December 31st and on or before September 31st for the semi-annual period ending the preceding June 30th, and at that time GPL was to submit to McKenzie the royalty statement for each such period together with the net amount of royalties, if any, after deducting any and all unrecouped advances and chargeable costs under the Agreement or any such other agreement.

56.     Under the GPL Songwriter Agreement, McKenzie was and is entitled to the following royalties:

(i)     Six cents ($0.06) per copy for each copy of sheet music in standard piano/vocal notation and each dance orchestration printed, published, and sold by GPL or its licensees, for which payment shall have been received by and/or credited to GPL, after deduction of returns.

(ii)    Ten percent (10%) of the wholesale selling price of each printed copy of each other arrangement and edition printed, published and sold in the United States and Canada by GPL or its licensees, for which payment shall have been received by and/or credited to GPL, after deduction of returns, except that in the event that any Compositions shall be used or caused to be used, in whole or in part, in conjunction with one or more other musical compositions in a folio, compilation, song book or other publication, McKenzie shall be entitled to receive that proportion of the foregoing royalty which the number of Compositions contained therein shall bear to the total number of royalty-bearing musical compositions therein.

(iii)   Fifty percent (50%) of any and all Net Receipts actually received by and/or credited to GPL in the United Kingdom from the exploitation by licensees of mechanical rights, grand rights, electrical transcription and reproduction rights, motion picture and television synchronization rights, dramatization rights and all other rights therein (except print rights and

public performance rights), whether or not such licensees are affiliated with, owned in whole or in part by, or controlled by GPL.

(iv)    If GPL shall collect both McKenzie's and GPL's share of public performance royalty income directly and such income shall not be collected by McKenzie's public performance society, GPL shall pay to McKenzie fifty percent (50%) of all such Net Receipts which are received by and/or credited to GPL in the United Kingdom from the exploitation of such rights in the Compositions, throughout the world.

(v)    Fifty percent (50%) of any and all Net Receipts, after deduction of foreign taxes, actually received by and/or credited to GPL in the United Kingdom from the exploitation of the Compositions in countries outside of the United Kingdom (other than public performance royalties), whether from collection agents, licensees, sub-publishers or others, and whether or not same are affiliated with, owned in whole or in part by, or controlled by GPL.

(vi)    In the event that one or more other songwriters are authors together with McKenzie of any Composition (including songwriters employed by GPL to add, change or translate the lyrics or to revise or change the music), the royalties shall be divided equally among McKenzie and the other songwriters unless another division of royalties shall be agreed upon in writing between the parties concerned and timely written notice of such division is submitted to GPL prior to payment.

17

57.     Upon information and belief, per the terms of the GPL Songwriter Agreement, GPL paid McKenzie an Advance on Royalties that she was to be paid in connection with the exploitation of the Masters, Albums, Compositions and/or Recordings.

58.     Upon information and belief, GPL and/or their respective successors, affiliates, and assigns, including but not limited to one or more of the Defendants, have continuously sold and commercially exploited the Masters, Albums, Compositions, and/or Recordings from the date of their release up and through the date of this Complaint.

59.     Upon information and belief, as of the date of this Complaint, GPL has fully recouped the Advance paid to McKenzie and all other costs and expenses incurred and paid by GPL in connection with the Masters, Albums, Compositions and/or Recordings, if any.

60.     Upon information and belief, all income generated by the commercial exploitation of the Masters, Albums, Compositions and/or Recordings to date was initially collected by and/or paid to GPL and/or its successors, affiliates, and assigns.

61.     Notwithstanding and despite McKenzie's full performance under the GPL Songwriter Agreement, to date, GPL and/or its successors-in-interest have failed to fully pay McKenzie her Royalties in connection with the commercial exploitation of the Masters, Albums, Compositions and/or Recordings and/or otherwise due under the GPL Songwriter Agreement.

F.  **GPL CO-PUBLISHING & ADMINISTRATION AGREEMENT**

62.     On or about March 20, 2014, McKenzie and GPL entered into a Co-publishing and Administration Agreement (hereinafter "GPL Co-Publishing and Administration Agreement" or "Co-Pub Agreement").

63.     In addition to the Defendants having rights in and to the Albums which featured the recorded performance of McKenzie, the Co-Pub Agreement assigned the Defendants an

ownership interest and the right to collect income generated by lyrics/music written by McKenzie.

64.     Under the Co-Pub Agreement, accountings as to royalties accruing or which otherwise would have accrued were to be made by GPL to McKenzie on or before March 31st for the semi-annual period ending the preceding December 31st and on or before September 30th for the semi-annual period ending the preceding June 30th, and at that time GPL was to submit to McKenzie the royalty statement for each such period together with the net amount of royalties, if any, after deducting any and all unrecouped advances and chargeable costs under the Co-Pub Agreement or any such other agreement.

65.     Under the Co-Pub Agreement, McKenzie was and is entitled to the following royalties:

(i)      Fifty percent (50%) of any and all Net Sums actually received (less any costs for collection) by GPL in the United States from the exploitation throughout the Territory of the Compositions by licensees of sheet music, arrangement and printed edition, mechanical rights, electrical transcription and reproduction rights and all other rights therein (except public performance rights and synchronization rights), whether or not such licensees are affiliated with, owned in whole or in part by, or controlled by GPL.

(ii)     Twenty percent (20%) of all Net Sums actually received (less any costs for collection) by GPL in the United States from the exploitation throughout the Territory of the Compositions by licensees of the so-called

"publisher's share" of performance rights whether or not such licensees
are affiliated with, owned in whole or in part by, or controlled by GPL.

(iii)     Fifty percent (50%) of any and all Net Sums actually received (less any
costs for collection) by GPL in the United States from the exploitation
throughout the Territory of the Compositions by licensees of
synchronization rights whether or not such licensees are affiliated with,
owned in whole or in part by, or controlled by GPL.

66.     The term of the Co-Pub Agreement was to be coterminous with the First
Recording Agreement.

67.     Therefore, upon McKenzie's delivery of the "I Rise" album, the Co-Pub
Agreement, which ran coterminous with the First Recording Agreement, was also concluded.

68.     Upon information and belief, per the terms of the Co-Pub Agreement, GPL paid
McKenzie an Advance on Royalties that she was to be paid in connection with the exploitation
of the Masters, Albums, Compositions and/or Recordings.

69.     Upon information and belief, GPL and/or their respective successors, affiliates,
and assigns, including but not limited to one or more of the Defendants, have continuously sold
and commercially exploited the Masters, Albums, Compositions and/or Recordings from the date
of their release up and through the date of this Complaint.

70.     Upon information and belief, as of the date of this Complaint, GPL has fully
recouped the Advance paid to McKenzie and all other costs and expenses incurred and paid by
GPL in connection with the Masters, Albums, Compositions and/or Recordings, if any.

71.     Upon information and belief, all income generated by the commercial exploitation of the Masters, Albums, Compositions and/or Recordings to date was initially collected by and/or paid to GPL and/or its successors, affiliates, and assigns.

72.     Notwithstanding and despite McKenzie's full performance under the Co-Pub Agreement, to date, GPL and/or its successors-in-interest have failed to fully pay McKenzie her Royalties in connection with the commercial exploitation of the Masters, Albums, Compositions and/or Recordings and/or otherwise due under the Co-Pub Agreement.

### G.  VP EXCLUSIVE RECORDING & ANCILLARIES AGREEMENT

73.     On or about November 1, 2014, McKenzie and VP Records entered into an Exclusive Recording and Ancillaries Agreement (hereinafter "VP Exclusive Recording and Ancillaries Agreement" or the "Second Recording Agreement").

74.     Under the Second Recording Agreement, accountings as to royalties accruing or which otherwise would have accrued were to be made by VP Records to McKenzie ninety (90) days from each June 30th and December 31st, together with payment of accrued royalties due to McKenzie, if any, on exploitations for which VP Records has received payment by the end of the applicable accounting period, less any advances VP Records had paid to McKenzie and/or bona fide costs/expenses incurred and paid in connection with the Masters, Albums, Compositions and/or Recordings.

75.     Under the Second Recording Agreement, McKenzie was and is entitled to the following royalties:

> (i)     Base royalty rate of fourteen percent (14%) (the "Base Rate") of the suggested retail list price ("SRLP") for all Albums (including for

avoidance of doubt the Back Catalog Albums) sold by via normal retail channels in the United States and Canada.

(ii)     With respect to Net Sales of Records sold for distribution outside of the United States and Canada, the Base Rate shall be multiplied by seventy five percent (75%) with sixty-six and two third percent (66-2/3%) for Records sold in England, France, and Germany and Japan and fifty percent (50%) for Records sold in the rest of the world.

(iii)     The royalty for Net Sales of premium Records, and budget Records (i.e., Records sold at sixty six percent (66%) of VP Records' top line price), shall accrue at one-half (1/2) of the Base Rate.

(iv)     The royalty for Net Sales of mid-priced records (i.e., Records sold at seventy five percent (75%) of VP Records' top line price) shall accrue at three-quarters (3/4) of the Base Rate of the Base Rate.

(v)     With respect to exploitations of Masters via third party licensees, the royalties payable to McKenzie shall be fifty percent (50%) of VP Records' Net Receipts, without regard to advances in connection therewith (if any).

(vi)     As to a Record not consisting entirely of Masters or Videos, McKenzie's royalty will be prorated in the proportion the Masters (or Videos, as applicable) that are embodied on the Record bear to the total number of royalty-bearing master recordings (or videos, as applicable) embodied on that Record.

(vii)     With respect to Records sold in the form of compact discs, digital downloads or similar internet-based transmissions or Record

configurations not specifically provided for herein, the royalty rate shall

be eighty-five percent (85%) of the otherwise applicable royalty rate.

76.     On or about January 11, 2017, McKenzie issued notification of the termination of

the Second Recording Agreement for VP Records' breach of the agreement by failing to timely

render payment of an in-pocket advance.

77.     On or about February 24, 2017, John McQueeney, VP Records' Director of

Business and Legal Affairs, issued a correspondence confirming the expiration of the Second

Recording Agreement.

78.     McKenzie did not deliver any Masters, Compositions and/or Recordings under

the Second Recording Agreement prior to the Second Recording Agreement terminating as a

result of VP Records' breach.

79.     Accordingly, VP Records and/or their respective successors, affiliates, and

assigns, including but not limited to one or more of the Defendants, do not have the right to

commercially exploit any of McKenzie's Masters, Albums, Compositions and/or Recordings that

Plaintiffs composed, recorded, and/or released from the Effective Date of the Second Recording

Agreement up and through the date of this Complaint.

80.     Notwithstanding the foregoing and upon information and belief, VP Records

and/or its successors-in-interest have in fact generated income by the commercial exploitation of

certain Masters, Albums, Compositions and/or Recordings that Plaintiffs composed, recorded,

and/or released from the Effective Date of the Second Recording Agreement up and through the

date of this Complaint, including McKenzie's album "Reggae Forever," and have failed to fully

pay McKenzie her Royalties in connection with the commercial exploitation of the Masters,

Albums, Compositions and/or Recordings.

H. **GPL DEAL MEMO**

81.     On or about July 10, 2008, one month after the release of her debut album, "The Strong One," McKenzie entered into a short form Deal Memo with GPL for exclusive songwriter services for a period of five (5) years (hereinafter the "GPL Deal Memo").

82.     Under the GPL Deal Memo, accountings as to royalties accruing or which otherwise would have accrued were to be made by GPL to McKenzie biannually ninety (90) days from June 30th and December 31st.

83.     Under the GPL Deal Memo, McKenzie was and is entitled to the following royalties:

(i)      Six cents ($0.06) per copy for each copy of sheet music sold in the United States and Canada.

(ii)     Ten percent (10%) of the wholesale selling price of each printed copy of each other arrangement sold, pro rata, in the United States and Canada.

(iii)    Fifty percent (50%) of net receipts (less foreign taxes and collection costs) by GPL from exploitation of: mechanical rights, grand rights, electrical transcription and reproduction rights, motion picture and television synchronization rights, dramatization rights and all other rights therein (except print rights and public performance rights) in the world.

(iv)     If GPL shall collect both McKenzie's and GPL's share of public performance royalty income directly and such income shall not be collected by McKenzie's public performance society, GPL shall pay to McKenzie fifty percent (50%) of all such Net Receipts which are received

24

by and/or credited to GPL in the United Kingdom from the exploitation of such rights in the Compositions, throughout the world.

84.     Upon information and belief, per the terms of the GPL Deal Memo, GPL paid McKenzie an Advance on Royalties that she was to be paid in connection with the exploitation of the Masters, Albums, Compositions and/or Recordings.

85.     Upon information and belief, GPL and/or their respective successors, affiliates, and assigns, including but not limited to one or more of the Defendants, have continuously sold and commercially exploited the Masters, Albums, Compositions and/or Recordings from the date of their release up and through the date of this Complaint.

86.     Upon information and belief, as of the date of this Complaint, GPL has fully recouped the Advance paid to McKenzie and all other costs and expenses incurred and paid by GPL in connection with the Masters, Albums, Compositions and/or Recordings if any.

87.     Upon information and belief, all income generated by the commercial exploitation of the Masters, Albums, Compositions and/or Recordings to date was initially collected by and/or paid to GPL and/or its successors, affiliates, and assigns.

88.     Notwithstanding and despite McKenzie's full performance under the GPL Deal Memo, to date, GPL and/or its successors-in-interest have failed to fully pay McKenzie her Royalties in connection with the commercial exploitation of the Masters, Albums, Compositions and/or Recordings otherwise due under the GPL Deal Memo.

I.  **MCKENZIE'S INDEPENDENT SUCCESS**

89.     In or around 2018, McKenzie independently released and produced her fifth album titled "Reggae Forever," which was nominated for the 61st Annual Grammy Awards in the Best Reggae Album category.

90.     "Reggae Forever" was executively produced by McKenzie and Andre Morris of Freemind Music LLC and was distributed by Tads Records.

91.     In or around 2019, McKenzie released the eight-track EP "Dimensions."

92.     In or around June 2021, McKenzie independently released and produced her album "Pamoja," which has been nominated for the 64th Annual Grammy Awards in the Best Reggae Album category.

## V.      CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Breach of VP Recording Agreement)

93.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 92 with the same force and effect as if set forth in full herein.

94.     On or about November 1, 2007, McKenzie and VP Records entered a valid and binding contract in the form of the VP Recording Agreement.

95.     McKenzie has fully performed her obligations under the VP Recording Agreement.

96.     VP Records has received and continues to receive income and royalty payments from distributors and/or third parties in connection with the Masters, Albums, Compositions and/or Recordings that were commercially released during the term of the VP Recording Agreement.

97.     Pursuant to the VP Recording Agreement, no less than two (2) times per year, VP Records was/is required to account to McKenzie for all income VP Records receives in connection with the Masters, Albums, Compositions and/or Recordings.

98.     VP Records and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, including GPL and STB, have breached the VP Recording Agreement through their failure to account and/or to pay McKenzie her share of profits from the Masters, Albums, Compositions and/or Recordings released and/or recorded by VP Records or its successors during the term of the VP Recording Agreement, including but not limited to "The Strong One, "Free Expressions," "Better Tomorrow," and "I Rise," and any other Masters, Albums, Compositions and/or Recordings featuring the recorded performance of McKenzie.

99.     By reason of the foregoing and continued breach of the VP Recording Agreement by VP Records and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, the Plaintiffs have been damaged in an amount to be determined at trial but which is believed to be in excess of Two Hundred and Fifty Thousand Dollars ($250,000.00).

## SECOND CAUSE OF ACTION

### (Breach of GPL Songwriter Agreement)

100.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 99 with the same force and effect as if set forth in full herein.

101.     On or about December 1, 2007, McKenzie and GPL entered a valid and binding contract in the form of the GPL Songwriter Agreement.

102.     McKenzie has fully performed her obligations under the GPL Songwriter Agreement.

103.     GPL has received and continues to receive income and royalty payments from distributors and/or third parties in connection with the Masters, Albums, Compositions and/or Recordings that were commercially released and/or published during the term of the GPL Songwriter Agreement.

104.    Pursuant to the GPL Songwriter Agreement, no less than two (2) times per year, GPL was/is required to account to McKenzie for all income GPL receives in connection with the Masters, Albums, and/or Recordings.

105.    GPL and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, including VP Records and STB, have breached the GPL Songwriter Agreement through their failure to account and/or to pay McKenzie her share of profits from the Masters, Albums, and/or Recordings released and/or published by GPL or successors during the term of the GPL Songwriter Agreement and any other Masters, Albums, Compositions and/or Recordings featuring the written compositions or recorded performances of McKenzie.

106.    By reason of the foregoing and continued breach of the GPL Songwriter Agreement by GPL and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, the Plaintiffs have been damaged in an amount to be determined at trial but which is believed to be in excess of Two Hundred and Fifty Thousand Dollars ($250,000.00).

## THIRD CAUSE OF ACTION

### (Breach of GPL Co-Publishing and Administration Agreement)

107.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 106 with the same force and effect as if set forth in full herein.

108.    On or about March 20, 2014, McKenzie and GPL entered a valid and binding contract in the form of the GPL Co-Publishing and Administration Agreement.

109.    McKenzie has fully performed her obligations under the GPL Co-Publishing and Administration Agreement.

110.    GPL has received and continues to receive income and royalty payments from distributors and/or third parties in connection with the Masters, Albums, Compositions and/or

Recordings that were commercially released during the term of the GPL Co-Publishing and
Administration Agreement.

111.    Pursuant to the GPL Co-Publishing and Administration Agreement, no less than
two (2) times per year, GPL was/is required to account to McKenzie for all income GPL receives
in connection with the Masters, Albums, and/or Recordings.

112.    GPL and/or its successor(s)-in-interest to the Masters, Albums, Compositions
and/or Recordings, including VP Records and STB, have breached the GPL Co-publishing and
Administration Agreement through their failure to account and/or to pay McKenzie her share of
profits from the Masters, Albums, Compositions and/or Recordings released and/or published by
GPL or successors during the term of the GPL Co-publishing and Administration Agreement and
any other Masters, Albums, Compositions and/or Recordings featuring the written compositions
and/or recorded performance of McKenzie.

113.    By reason of the foregoing and continued breach of the GPL Co-publishing and
Administration Agreement by GPL and/or its successor(s)-in-interest to the Masters, Albums,
Compositions and/or Recordings, the Plaintiffs have been damaged in an amount to be
determined at trial but which is believed to be in excess of Two Hundred and Fifty Thousand
Dollars ($250,000.00).

## FOURTH CAUSE OF ACTION

### (Breach of VP Exclusive Recording and Ancillaries Agreement)

114.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 113 with the
same force and effect as if set forth in full herein.

115.    On or about November 1, 2014, McKenzie and VP Records entered a valid and
binding contract in the form of the VP Exclusive Recording and Ancillaries Agreement.

29

116. McKenzie has fully performed her obligations under the VP Exclusive Recording and Ancillaries Agreement.

117. VP Records has received and continues to receive income and royalty payments from Distributors and/or third parties in connection with the Masters, Albums, Compositions and/or Recordings that were commercially released during the term of the VP Exclusive Recording and Ancillaries Agreement.

118. Pursuant to the VP Exclusive Recording and Ancillaries Agreement, no less than two (2) times per year, VP Records was/is required to account to McKenzie for all income VP Records receives in connection with the Masters, Albums, Compositions and/or Recordings.

119. VP and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, including GPL and STB, have breached the VP Exclusive Recording and Ancillaries Agreement through their failure to account and/or to pay McKenzie her share of profits from the Masters, Albums, Compositions and/or Recordings released and/or recorded by VP Records or its successors during the term of the VP Exclusive Recording and Ancillaries Agreement and any other Masters, Albums, Compositions and/or Recordings featuring the written compositions and/or recorded performance of McKenzie.

120. By reason of the foregoing and continued breach of the VP Exclusive Recording and Ancillaries Agreement by VP and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, the Plaintiffs have been damaged in an amount to be determined at trial but which is believed to be in excess of Two Hundred and Fifty Thousand Dollars ($250,000.00).

## FIFTH CAUSE OF ACTION

### (Breach of GPL Deal Memo)

121.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 120 with the same force and effect as if set forth in full herein.

122.    On or about July 10, 2008, McKenzie and GPL entered a valid and binding contract in the form of the GPL Deal Memo.

123.    McKenzie has fully performed her obligations under the GPL Deal Memo.

124.    GPL has received and continues to receive income and royalty payments from distributors and/or third parties in connection with the Masters, Albums, Compositions and/or Recordings that were commercially released during the term of the GPL Deal Memo.

125.    Pursuant to the GPL Deal Memo, no less than two (2) times per year, GPL was/is required to account to McKenzie for all income GPL receives in connection with the Masters, Albums, Compositions and/or Recordings.

126.    GPL and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, including VP Records and STB, have breached the GPL Deal Memo through their failure to account and/or to pay McKenzie her share of profits from the Masters, Albums, Compositions and/or Recordings released and/or published by GPL or its successors during the term of the GPL Deal Memo and any other Masters, Albums, Compositions and/or Recordings featuring the written compositions and/or recorded performance of McKenzie.

127.    By reason of the foregoing and continued breach of the GPL Deal Memo by GPL and/or its successor(s)-in-interest to the Masters, Albums, Compositions and/or Recordings, the Plaintiffs have been damaged in an amount to be determined at trial but which is believed to be in excess of Two Hundred and Fifty Thousand Dollars ($250,000.00).

31

## SIXTH CAUSE OF ACTION

### (Fraud)

128.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 127 with the same force and effect as if set forth in full herein.

129.     Defendants' wanton disregard of their obligations under the VP Recording Agreement, the GPL Songwriter Agreement, the GPL Co-Publishing and Administration Agreement, the VP Exclusive Recording and Ancillaries Agreement, and the GPL Deal Memo (collectively the "Royalty Agreements") emanates from their preconceived and undisclosed intention of not performing them and of continuing their dishonest accounting schemes so as to perpetuate their longstanding pattern of corrupt accounting practices that have deprived Plaintiffs of millions of dollars in royalties.

130.     Defendants' fraudulent practices and their self-serving course of conduct was designed to enrich themselves at Plaintiffs' expense. Toward this end, and among other things, Defendants falsified documents by disseminating underreported royalties, utilizing improper rates and prices, hiding lucrative side deals with third parties, selling bootleg copies of McKenzie's music, exploiting the Masters, Albums, Compositions, and/or Recordings without permission, and generally using evasive tactics to conceal information from Plaintiffs regarding the true disposition, use, and earnings of the Masters, Albums, and/or Recordings.

131.     These activities, particularly when viewed in light of Defendants' history of malfeasance, are indicative of their fraudulent intent to continue to take advantage of Plaintiffs by perpetuating their deceitful conduct. Defendants never possessed a good faith intention of fully performing under the Royalty Agreements.

132.     In addition to concealing the true disposition of the Masters, Albums, Compositions, and/or Recordings, Defendants fraudulently and intentionally failed to disclose various collateral benefits they planned to receive, and did receive, at Plaintiffs' expense. These benefits include, but are not limited to, Defendants' receipt of payments based on unauthorized and undisclosed deals with third party companies and other licensees, and Defendants' receipt of third-party benefits, bargaining power and other promotional advantages for their other artists in exchange for unauthorized dissemination and secret exploitation of the Masters, Albums, Compositions, and/or Recordings.

133.     These concealed benefits, omitted from royalty statements, reflect collateral purposes behind Defendants' representations and assurances contained in the Royalty Agreements. Defendants concealed these secret collateral "side deals" with various third parties and they concealed their use of McKenzie's Masters, Albums, Compositions, and/or Recordings as currency with vendors for their own advantage, in order to pursue their ulterior motives independent of the bargain comprising the Royalty Agreements.

134.     Defendants were at all times aware that their misrepresentations regarding these extraneous third-party deals were fraudulent, false and deliberately misleading in connection with the negotiation and execution of the Royalty Agreements, and that their misrepresentations were material to Plaintiffs' decision to enter into the Royalty Agreements. Defendants made these misrepresentations and omissions knowingly and with the intention of inducing Plaintiffs to rely upon them in deciding to enter into the Royalty Agreements.

135.     Had Defendants not made these misrepresentations and omissions, but rather disclosed that they had these secret side deals with the third-party licensees and that they planned to continue to use McKenzie's recordings to further their business advantages for their other

artists and at Plaintiffs' expense, Plaintiffs would not have entered into the Royalty Agreements or would have done so based on substantially different and more advantageous terms.

136.     Plaintiffs reasonably and justifiably relied upon Defendants' representations in entering into the Royalty Agreements.

137.     As the direct and proximate result of Defendants' fraudulent conduct and collateral side deals, Plaintiffs have sustained and will sustain damages including the loss of royalty income and the dilution of the legitimate market for sale of McKenzie's Masters, Albums, Compositions and/or Recordings together with other and further damages to be proved at trial.

138.     Furthermore, Defendants were uniquely positioned to ensure the success of their massive fraudulent scheme and their gross, systematic and pervasive failing to report or underreporting of royalties. At all times relevant to the negotiation and execution of the Royalty Agreements, Defendants had superior knowledge that they had instituted various procedures and policies to defraud Plaintiffs, and intended to continue to defraud Plaintiffs, from receiving the full amount of royalties due.

139.     At all pertinent times, Defendants had sole access to, and knew the true facts concerning their underreporting, but intentionally misrepresented and failed to disclose and actively concealed the true disposition of the recordings and the royalties related thereto, with knowledge that Plaintiffs would and did rely upon such misrepresentations and omissions to Plaintiffs' detriment in an effort to cause Plaintiffs to forego millions of dollars in royalties.

140.     Defendants' superior knowledge regarding the exploitation and true disposition of McKenzie's recordings was not available to Plaintiffs and Defendants knew this and used this to their advantage to conceal their profits. Indeed, even after years of effort by Plaintiffs'

representatives, auditors, and attorneys to investigate and uncover the extent of underreported

royalties, the specific details of Defendants' schemes and the full nature, scope and extent of

their underreporting remains peculiarly within Defendants' knowledge, which fact is exacerbated

by Defendants' continuous failure to respond to Plaintiffs' request for an accurate accounting.

141. Plaintiffs could not with reasonable diligence have discovered Defendants'

misconduct and collateral "side deals" because Defendants' malfeasance was reflected

principally by omissions from, and misrepresentations contained in, royalty statements furnished

by Defendants and Defendants maintained exclusive knowledge of, and control over, the

documents, paper and things containing the true facts concerning royalties payable to Plaintiffs.

142. Defendants have acted willfully, maliciously and with gross, wanton and

deliberate dishonesty and with complete disregard for the interests of Plaintiffs.

143. Defendants' conduct was and is morally reprehensible, especially when viewed in

light of their endemic pattern of cheating Plaintiffs out of royalties.

144. An award of exemplary and punitive damages is necessary to punish and deter

such conduct so that it does not occur again.

145. As the direct and proximate result of Defendants' fraudulent conduct, Plaintiffs

are entitled to recover compensatory damages from Defendants in an amount to be determined at

trial, but not less than Five Million Dollars ($5,000,000.00), together with other damages caused

by Defendants' conduct, together with appropriate interest thereon, and exemplary and punitive

damages.

## SEVENTH CAUSE OF ACTION

### (Unlawful Appropriation and Unjust Enrichment)

146.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 145 with the same force and effect as if set forth in full herein.

147.    Several of the Masters, Albums, Compositions, and/or Recordings that Defendants have commercially exploited to the detriment of Plaintiffs were written and/or recorded by McKenzie and produced and/or published by Freemind prior to December 1, 2007, which means they were written and/or recorded by McKenzie and/or produced and/or published by Freemind prior to McKenzie entering into the Royalty Agreements.

148.    Defendants did not and do not have the right to commercially exploit the pre-December 1, 2007 Masters, Albums, Compositions and/or Recordings written and/or recorded by McKenzie and produced and/or published by Freemind. Defendants only had the right to commercially exploit those Masters, Albums, Compositions and/or Recordings which were executively produced and/or published by Defendants and released on the following albums: "The Strong One," "Free Expressions," "Better Tomorrow," and "I Rise."

149.    Defendants did not and do not have the right to commercially exploit or sell certain Masters, Albums, Compositions and/or Recordings, including but not limited to "Wrong Address," "Roots," and "Jah Chariot," pursuant to any of the Royalty Agreements they entered into with McKenzie and/or absent any agreement with Freemind.

150.    Additionally, Defendant STB did not and does not have the right to commercially exploit McKenzie's Masters, Albums, Compositions and/or Recordings, including but not limited to "Warrior Love" "and "Roots," in its reggae compilations.

151.     Notwithstanding the foregoing, Defendants sold certain Masters, Albums, Compositions and/or Recordings, which included the written compositions and recorded performance of McKenzie and/or which were produced and/or published by Freemind.

152.     As a result of their acts of unlawful appropriation, Defendants have been unjustly enriched at the expense of Plaintiffs by selling certain Masters, Albums, Compositions and/or Recordings, including but not limited to "Wrong Address," "Roots," and "Jah Chariot," for an amount in excess of Two Hundred and Fifty Thousand Dollars ($250,000.00), the exact accounting of which is the sole knowledge of Defendants.

153.     However, Defendants have failed to pay Plaintiffs for their services in connection with the Masters, Albums, Compositions and/or Recordings.

154.     Defendants have unlawfully obtained money, which under the circumstances in equity and good conscience they ought not to retain.

155.     Defendants, by failing to remit to Plaintiffs proper compensation for McKenzie's recording and writing services and Freemind's production and publishing services, Defendants have been unjustly enriched in an amount to be determined at trial, but in any event in an amount not less than Two Hundred and Fifty Thousand Dollars ($250,000.00).

156.     As the acts, practices and course of conduct in which Defendants have engaged are willful and malicious, Plaintiffs are entitled to exemplary and punitive damages in an amount to be set by the trier of fact.

## EIGHTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

157.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 156 with the same force and effect as if set forth in full herein.

158.    By virtue of the rights assigned to Defendants pursuant to the Royalty Agreements, Defendants and their respective successors-in-interest and/or assignees were the administrators of Plaintiffs interests in the Masters, Albums, Compositions and/or Recordings.

159.    Based on the foregoing, the Defendants are Plaintiffs' agents in connection with the Masters, Albums, Compositions and/or Recordings and owe a fiduciary duty to Plaintiffs.

160.    Plaintiffs reasonably placed special trust and confidence in, and relied upon the integrity and fidelity of, Defendants with respect to the exploitation of the Masters, Albums, Compositions and/or Recordings, including but not limited to acting as Plaintiffs administrator in connection with compositions that were not subject to the co-publishing and administration agreements they entered into with the Plaintiffs and continuing to administer the Compositions after their rights to act in such capacity terminated pursuant to their respective agreements, and with respect to collecting, accounting for and paying royalties, furnishing true, accurate and complete royalty statements and maintaining records with respect thereto.

161.    To the extent that Defendants received sums of money generated and derived by the commercial exploitation of the Masters, Albums, Compositions and/or Recordings, they held such monies as fiduciaries and trustees for the benefit of Plaintiffs.

162.    Defendants had a duty of care, a duty of loyalty and duty of honesty to Plaintiffs, and as such had affirmative duties to maximize the value of the Masters, Albums, Compositions and/or Recordings, ensure that Defendants' interests in the Masters, Albums, Compositions

and/or Recordings were properly registered with applicable performing right societies and other collection agencies to collect all income generated by the Masters, Albums, Compositions and/or Recordings and to properly account to and pay Plaintiffs in connection with the Masters, Albums, Compositions and/or Recordings.

163.     Defendants abused this special relationship with Plaintiffs by taking the valuable Masters, Albums, Compositions and/or Recordings and exploiting them for their own benefit at the expense of Plaintiffs. While Plaintiffs relied upon Defendants to act honestly and in good faith and without deception, Defendants continued their pervasive, institutionalized practice of failing to report or intentionally and fraudulently underreporting royalties and rendering false statements and accountings thereby intentionally harming Plaintiffs.

164.     The fraudulent exploitation of McKenzie and the Masters, Albums, Compositions and/or Recordings to further their own catalogue is a gross violation of Defendants' fiduciary obligation to Plaintiffs to accurately, completely and honestly account for any and all uses of, and income earned from the Masters, Albums, Compositions and/or Recordings.

165.     By reason of the foregoing and other acts not yet known to Plaintiffs, Defendants have breached their fiduciary obligations to Plaintiffs and, as a direct and proximate result of Defendants' breach of their fiduciary obligations, Plaintiffs have been damaged in an amount to be proved at trial but not less than Two Hundred and Fifty Thousand Dollars ($250,000.00), together with exemplary and punitive damages.

## NINTH CAUSE OF ACTION

### (Conversion)

166.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 165 with the same force and effect as if set forth in full herein.

167.    Under the Royalty Agreements, Defendants owe a duty to McKenzie to pay royalties for work created by McKenzie and which are contractually McKenzie's property.

168.    Defendants are wrongfully and intentionally depriving Plaintiff of her property.

169.    Upon information and belief, Defendants have diverted away from McKenzie and given to themselves, Plaintiffs' property right to royalties for recording, writing, co-writing and/or producing the Masters, Albums, Compositions and/or Recordings.

170.    Every time that Defendants received and continues to receive royalties in connection with the Masters, Albums, Compositions and/or Recordings, which include McKenzie's royalties, and Defendants did not and do not contact Plaintiffs and pay over to Plaintiffs McKenzie's royalties, Defendants committed and commits repeated acts of Conversion, the equivalent of theft.

171.    Defendants' "serial" acts of conversion are oppressive, fraudulent, committed with malice, and in conscious disregard of Plaintiffs' rights, causing Plaintiffs to suffer consequential damages in excess of the Five Hundred Thousand Dollar ($500,000.00) minimum jurisdiction of the Commercial Division of this Court.

### TENTH CAUSE OF ACTION

### (Tortious Interference)

172.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 171 with the same force and effect as if set forth in full herein.

173.    In addition to enjoying established business relationships and economic advantages, McKenzie continually seeks to establish advantageous prospective business relationships and financial opportunities.

174.    Defendants' conduct constituted a tortious, unreasonable, unprivileged, and malicious interference with McKenzie's ability to establish prospective advantageous business relationships through the use of wrongful and unfair means and went beyond the bounds of legitimate competition.

175.    As set forth above, Defendants have fraudulently concealed their true use and disposition of Masters, Albums, Compositions and/or Recordings of McKenzie and have either failed to render proper accounting statements regarding McKenzie's royalties or intentionally rendered dishonest and grossly deficient accounting statements, through the use of wrongful means of competition, including but not limited to the following:

   (i)    Making false, misleading, and disparaging representations that Defendants were authorized to negotiate on behalf of McKenzie for the Masters, Albums, Compositions and/or Recordings;

   (ii)   Failing to provide McKenzie with a proper accounting; and

   (iii)  Continuing to market and sell the Masters, Albums, Compositions and/or Recordings after the Royalty Agreements were terminated, thereby depriving McKenzie of revenues and interfering with McKenzie's efforts to reestablish herself in the industry as the producer and distributor of her own music.

176.    By reason of the foregoing, McKenzie has been damaged in an amount to be determined at trial, but not less than Two Million Dollars ($2,000,000.00).

177.    In addition, because Defendants' wrongful conduct was undertaken in wanton disregard of McKenzie's rights and with a high degree of moral culpability, McKenzie should

recover an award of punitive or exemplary damages, in an amount to be determined at trial, but not less than Two Million Dollars ($2,000,000.00).

### ELEVENTH CAUSE OF ACTION

**(Accounting)**

178.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 177 with the same force and effect as if set forth in full herein.

179.     A fiduciary or other special trust relationship exists between McKenzie and Defendants for which an accounting of Defendants' books and records is appropriate to the extent necessary to trace the royalties due and owed to Plaintiffs as described above.

180.     Defendants' also have a duty under the contracts to Plaintiffs which obligates the Defendants to account and disclose all financial information material to McKenzie's royalty entitlement.

181.     Defendants' failure to provide an accounting to Plaintiffs is a direct and material breach of the Royalty Agreements.

182.     In the absence of an accounting of Defendants' books and records as well as Defendants' agents' books and records, McKenzie cannot know the precise amount of monies received by Defendants (as either an advance or royalties) earned from the exploitation of the Masters, Albums, Compositions and/or Recordings in question.

183.     Upon information and belief, as agent for Defendants, Broadcast Music Inc. as a matter of proper business practice, maintains detailed statements of royalty transactions in connection with Plaintiffs' Masters, Albums, Compositions and/or Recordings.

184.    VP Records, as a matter of proper business practice, maintains detailed statements of all royalty transactions between VP Records and/or its successors and assigns and the applicable third-party licensees.

185.    Upon information and belief, the detailed statement of transactions maintained by VP Records is similar to a general ledger in that it reflects revenues generated from various sources.

186.    The detailed statement of transactions is kept current and in a reasonable permanent form and manner and goes back to the very first sale of the Masters, Albums, Compositions and/or Recordings until present and is "open" meaning that VP Records is continually exploiting the Masters, Albums, Compositions and/or Recordings in many ways including, but not limited, to Masters, Albums, Compositions and/or Recordings sales, digital downloads, "streaming," and other advertising and revenue generating broadcast and commercial performances.

187.    As a result of the foregoing, there are present and future transactions arising from the commercial exploitation of the Masters, Albums, Compositions and/or Recordings which will produce royalty income to the Plaintiffs and the right to accounting from the Defendants and their affiliates and agents should therefore be ordered by this Court to continue unless Plaintiffs agree otherwise.

188.    In the absence of the Court ordering an accounting from Defendants and their affiliates and agents, Plaintiffs will continue to suffer consequential damages in excess of the Five Hundred Thousand Dollar ($500,000.00) minimum jurisdiction of the Commercial Division of this Court.

## TWELFTH CAUSE OF ACTION

### (Declaratory Judgment)

189.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 188 with the same force and effect as if set forth in full herein.

190.     Defendants are legally obligated under the Royalty Agreements to account directly to Plaintiffs on McKenzie's royalties.

191.     Defendants and any of Defendants' affiliates and agents, as royalty manager, fiduciary, beneficiary and, perhaps a necessary party, unreasonably refused to comply with Plaintiff's demands for a proper accounting.

192.     Plaintiffs request a Declaratory Judgment construing the underlying contracts, VP Recording Agreement, GPL Songwriter Agreement, GPL Co-Publishing and Administration Agreement, VP Exclusive Recording and Ancillaries Agreement, and the GPL Deal Memo, and determining that Defendants and the Defendants' affiliates and agents, as royalty manager, must comply with Plaintiffs' demands for an accounting.

## THIRTEENTH CAUSE OF ACTION

### (Constructive Trust)

193.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 192 with the same force and effect as if set forth in full herein.

194.     Defendants and their professional affiliates and agents have received royalties due to and owned by McKenzie and have a fiduciary duty to preserve and account for those monies.

195.     Plaintiffs request that this Court impose a constructive trust upon the Defendants and Defendants' assets in a sum equivalent to all such royalties and monies wrongfully withheld by the Defendants and due and owed to Plaintiff.

## JURY DEMAND

The Plaintiffs demand a trial by jury on all causes of action alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs, Shauna McKenzie p/k/a Etana and Freemind Music LLC demand judgment against the Defendants as follows:

(a) On the first cause of action for breach of contract, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(b) On the second cause of action for breach of contract, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(c) On the third cause of action for breach of contract, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(d) On the fourth cause of action for breach of contract, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(e) On the fifth cause of action for breach of contract, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be

determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(f) On the first cause of action through the fifth cause of action, an accounting of all monies, income, profit and/or expenses in connection with the commercial exploitation of the Masters, Albums, Compositions, Recordings and/or Merchandise from inception to date and/or in the alternative for the fourteen (14) year period prior to the filing of this Complaint;

(g) On the first cause of action through the fifth cause of action, terminating Defendants rights pursuant to the terms of the VP Recording Agreement, GPL Songwriter Agreement, GPL Co-Publishing and Administration Agreement, VP Exclusive Recording and Ancillaries Agreement, and the GPL Deal Memo to: (a) collect any future income from the Masters, Compositions and Merchandise which is payable to the Plaintiffs; and (b) act as the Plaintiffs' copyright administration connection with the Compositions;

(h) On the first cause of action through the fifth cause of action, imposing a constructive trust over any and all monies wrongfully held by Defendants that rightfully belongs to Plaintiffs under VP Recording Agreement, GPL Songwriter Agreement, GPL Co-Publishing and Administration Agreement, VP Exclusive Recording and Ancillaries Agreement, and the GPL Deal Memo;

(i) On the sixth cause of action, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(j) On the seventh cause of action, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(k) On the eighth cause of action, that Plaintiffs be awarded compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00);

(l) On the ninth cause of action, that Plaintiffs be awarded actual and compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00), with interest;

(m) On the tenth cause of action, that Plaintiffs be awarded actual and compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00), with interest;

(n) On the eleventh cause of action, that Plaintiffs be awarded actual and compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial, but that is not less than Two Hundred and Fifty Thousand Dollars ($250,000.00), with interest;

(o) On the fifth cause of action through the eleventh cause of action, that Plaintiffs be awarded punitive and exemplary damages in a sum to be set by the trier of fact; and

(p) Together with pre- and post-judgment interest, attorneys' fees, costs, and disbursements as provided by law and such other and further relief as the court deems just and proper.

DATED:       January 7, 2022

        New York, New York

By: _____

Miami Entertainment Law Group

Celeste N. McCaw, Esq.

44 Court Street, Suite 1217

Brooklyn, New York 11201

Tel: (305) 417-6450

*Attorneys for Plaintiff*

48