UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SHAUNA MCKENZIE-MORRIS, *et al.*,

         Plaintiffs,

     -against-

V.P. RECORDS RETAIL OUTLET, INC., *et al.*,

         Defendants.

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/30/2022

1:22-cv-1138-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

## I.  INTRODUCTION

Shauna McKenzie-Morris, better known by her performing name "Etana," is a successful Jamaican reggae artist. Her career highlights would be the envy of most entertainers: Multiple hit records and singles, two Grammy award nominations, and even an album that reached the top of the Reggae Billboard Charts. Nearly two decades into her career, McKenzie-Morris's distinctive sound is widely recognized, respected, and loved in her native country and around the world.

While joyous and buoyant rhythms underlie much of McKenzie-Morris's music, this case sounds in much harsher tones. As her career developed, McKenzie-Morris entered into a series of agreements with record labels. Though the contracts differ in their specifics, the gravamen of McKenzie-Morris's allegations apply to each: The record labels, she says, failed to properly account for and pay her royalties due under each deal. As a result, McKenzie-Morris and a limited liability company that she co-owns have brought a fourteen-count complaint against the record labels—various entities related to VP Records and Greensleeves Publishing, Ltd.—that includes contract claims, tort claims, and various requests for relief.

VP Records and Greensleeves have moved to dismiss the complaint in part as to the causes of action that do not sound in breach of contract.  Because none of the non-contract-based claims except for the fraud cause of action against VP Records are plausibly stated, the motion to dismiss is GRANTED IN PART.

## II.    BACKGROUND[1]

Plaintiff Shauna McKenzie-Morris, professionally known as Etana, is a Jamaican reggae artist.  Dkt. No. 23 (First Amended Complaint, or "FAC") ¶ 1.  In total, she has released eight albums and one EP, been nominated for two Grammy Awards, and had multiple albums hit the Reggae Billboard Charts—including an album that reached #1 on that list.  FAC ¶¶ 60–63, 103–109; *see also* FAC ¶¶ 33–40 (further describing McKenzie-Morris's background and success).  She collects royalties through Plaintiff Freemind LLC, an active legal entity that also produces music for various artists, including McKenzie-Morris.  FAC ¶ 32.

Defendant VP Records—the collective name for defendants VP Records Retail Outlet, V.P. Music Group, V.P. Record Distributors, VP Records of Brooklyn, and STB Music—is the largest reggae label, distributor, and publisher in the world.  FAC ¶ 51.  Defendant Greensleeves Publishing, Ltd. ("GPL," and together with VP Records, "Defendants"), formerly a British record label known as Greensleeves Records, was acquired and renamed by VP Records in February 2008.  FAC ¶¶ 52–53.  From 2007–2014, McKenzie-Morris entered into several contracts with Defendants, which form the foundation of this litigation.  FAC ¶ 3.

The parties' formal relationship began in May 2007, when McKenzie-Morris signed an exclusive recording agreement with VP Records for the delivery of four albums.  FAC ¶ 57; *see* FAC

---

[1] The facts are drawn from Plaintiff's amended complaint.  Dkt. No. 23 ("FAC").  For this motion, the Court must accept as true the facts alleged in the amended complaint.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ex. C.  Under that agreement, VP Records had the responsibility to both account for and pay royalties to McKenzie-Morris for sales of the albums delivered under the contract.  FAC ¶ 58; *see* FAC ¶ 59 (setting out the contract's terms in detail).  The agreement was structured so that VP Records was required to pay McKenzie-Morris any royalties in excess of (1) what VP Records initially provided McKenzie-Morris as an advance on royalties, and (2) any other costs or expenses incurred by VP Records in connection with the albums.  FAC ¶¶ 65–68.  Between June 2008 and October 2014, McKenzie-Morris delivered the four albums under the VP Recording Agreement. FAC ¶¶ 60–64.  The albums were successful, with the fourth album—entitled "I Rise"—reaching the top spot on the Reggae Billboard Charts.  FAC ¶ 63.  Upon the delivery of the fourth album, McKenzie-Morris had fully performed under the Agreement, which was then concluded.  FAC ¶ 64. McKenzie-Morris alleges, however, that despite her performance and VP Records having recouped its advance and any expenses associated with the albums, VP Records has failed to pay royalties in connection with the albums since March 31, 2020.  FAC ¶ 69.

After the release of her first album (entitled "The Strong One") under the VP Recording Agreement, McKenzie-Morris entered into a short form "deal memo" with GPL (the "GPL Deal Memo").  FAC ¶ 70; *see* FAC Ex. E.  That agreement was then formalized through an agreement (the "GPL Songwriter Agreement").  FAC ¶ 73, *see* FAC Ex. F.[2]  Under the GPL Songwriter Agreement, GPL was given rights and interests in McKenzie-Morris's musical compositions that she had previously written or that she wrote during the five-year term of the agreement.  *See* Ex. F ¶ 3.1. Similar to VP Records' responsibilities under the VP Recording Agreement, under the GPL Songwriter Agreement, GPL had the responsibility to account for and pay royalties to McKenzie-Morris.  FAC ¶ 75; *see* FAC ¶¶ 72, 76 (setting out in detail the royalties that McKenzie-Morris was

---

[2] These two agreements are mislabeled in the FAC as being attached at Exhibits F and G, respectively.  *See* FAC ¶¶ 70, 73.  They are actually attached to the FAC at Exhibits E and F, respectively.

entitled to under the agreement).  And like the VP Recording Agreement, the GPL Songwriter Agreement was structured so that once GPL recouped the money that it had paid as an advance on royalties and any expenses incurred in executing the agreement, McKenzie-Morris was entitled to royalty payments.  FAC ¶¶ 80–82.  McKenzie-Morris alleges, however, that despite her performance, GPL has failed to fully pay her royalties under this agreement.  FAC ¶ 83.

McKenzie-Morris also raises several other issues with this contract.  First, she alleges that when she negotiated this deal with GPL, she was not aware that GPL had been acquired by VP Records.  FAC ¶¶ 53–56.  In fact, she claims that Olivier Chastan—then the Executive Vice President of VP Records—sent an email representing that "VP Records did not administer [GPL] in the USA," even though that was inaccurate.  FAC ¶ 186.  McKenzie-Morris would not have signed the deal, she says, but for that misrepresentation.  FAC ¶ 187.  Second, McKenzie-Morris alleges that she was not aware, at the time of signing this deal, that GPL was not a lawfully organized corporate entity.  FAC ¶ 74.  Finally, McKenzie-Morris takes issue with what she characterizes as the "backdating" of the GPL Songwriter Agreement:  That agreement stated that it was effective "as of" December 1, 2007, even though the parties did not actually sign it until mid-2008.  FAC ¶ 73.

In March 2014, McKenzie-Morris entered another agreement with GPL, which gave GPL rights in albums featuring McKenzie-Morris's recorded performances and assigned GPL an ownership interest in, and the right to collect income generated by, McKenzie-Morris's lyrics and music (the "GPL Co-Pub Agreement").  FAC ¶¶ 84–85, *see* FAC Ex. G.[3]  As under the other contracts at issue in this case, GPL had the obligation to account for and pay royalties to McKenzie-Morris.  FAC ¶¶ 86–87.  And like those other agreements, the royalties were structured so that once GPL recouped money paid as an advance on royalties and any expenses incurred in executing the

---

[3] The GPL Co-Pub Agreement is mislabeled in the FAC as "Exhibit H," FAC ¶ 84, but is attached to the FAC as Exhibit G.

agreement, McKenzie-Morris was entitled to royalty payments.  FAC ¶ 86.  Further, this agreement was made coterminous with the VP Recording Agreement, *see* FAC ¶ 88, so McKenzie-Morris's performance of it was completed when she delivered the fourth album ("I Rise") under the VP Recording Agreement, *see* FAC ¶ 89.  McKenzie-Morris alleges that although she fully performed her obligations under this contract and GPL has recouped its advance and any expenses associated with this agreement, GPL has failed to fully pay McKenzie-Morris royalties owed under the GPL Co-Pub Agreement.  FAC ¶¶ 92–94.

Finally, in November 2014, McKenzie-Morris signed an additional deal with VP Records (the "VP Exclusive Recording Agreement").  FAC ¶ 95; *see* FAC Ex. D.  Under this agreement, like the others, VP Records was obligated to account for and pay royalties to McKenzie-Morris.  FAC ¶¶ 96–97.  McKenzie-Morris terminated this agreement in January 2017 because VP Records failed to pay her an agreed-upon advance, FAC ¶ 98; in February 2017, VP Records confirmed the Agreement's termination.  FAC ¶ 99.  Nonetheless, according to Plaintiffs, VP Records proceeded—after that date—to generate income from records that were the subject of the VP Exclusive Recording Agreement but have failed to pay McKenzie-Morris the full royalties to which she was entitled under the Agreement.  FAC ¶ 102.

On January 7, 2022, Plaintiffs filed a complaint against Defendants in the Supreme Court of New York, County of New York.  Dkt. No. 1-1.  Defendants removed the case to this Court on February 9, 2022.  Dkt. No. 1; *see* Dkt. No. 1-3.  Plaintiffs filed their First Amended Complaint on April 19, 2022, which contains fourteen causes of action:  four that sound in breach of contract (counts 1–4) and ten that do not (counts 5–14).  *See* Dkt. No. 23.  On May 24, 2022, Defendants filed a motion to dismiss Plaintiffs' ten non-contract-based claims.  Dkt. No. 26 (motion); Dkt. No. 28 (memorandum in support, or "Defs' Mem.").  On June 21, 2022, Plaintiffs opposed that motion,

Dkt. No. 33 ("Pl's Opp."), and McKenzie-Morris submitted a supplemental affirmation in support of the opposition, Dkt. No. 33-1.  Defendants replied on June 28, 2022.  Dkt. No. 39 ("Reply").

## III.   LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  And "[t]he tenet that a court must accept" as true a complaint's factual allegations does not apply "to legal conclusions." *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570.  A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  The plaintiff's claim must be more than merely "speculative." *Twombly*, 550 U.S. at 545.  And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility. *Iqbal*, 556 U.S. at 679 (citation omitted).

## IV.   DISCUSSION

Defendants have moved to dismiss counts five through fourteen of Plaintiffs' amended complaint. *See* Dkt. No. 28.  The Court finds that Plaintiffs have properly pleaded their sixth cause of action for fraud against VP Records.  For the reasons that follow, however, Plaintiffs' fifth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth and fourteenth causes of action against all

Defendants, as well as the sixth cause of action as against GPL, must be dismissed at this time—although Plaintiff will be given leave to replead each claim.

### A. Consideration of Plaintiffs' Supplemental Declaration

As an initial matter, the Court cannot consider McKenzie-Morris's supplemental affirmation attached to Plaintiffs' opposition to the motion to dismiss. *See* Dkt. No. 33-1. It is bedrock civil procedure that "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," as well as documents that are "integral to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal citation and quotation marks omitted). McKenzie-Morris's supplemental affirmation does not fit any of these categories; accordingly, the Court "cannot properly consider [it] in connection with this motion." *Schentag v. Nebgen*, No. 17-cv-8734, 2018 WL 3104092, at *11 n.9 (S.D.N.Y. 2018) (Woods, J.); *see also, e.g.*, *In re Agape Litig.*, 773 F. Supp. 2d 298, 316 (E.D.N.Y. 2011) ("It is well-settled that a plaintiff cannot amend the complaint through briefs and affidavits.").[4]

### B. Fifth Cause of Action: Copyright Infringement

Plaintiff has failed to state a claim for copyright infringement. Absent exceptions not relevant here, "[b]efore pursuing an infringement claim in court," a copyright claimant "must comply with [17 U.S.C.] § 411(a)'s requirement that 'registration of the copyright claim has been made.'" *Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019) (citing 17 U.S.C. § 411(a)); *see also id.* ("[R]egistration is akin to an administrative exhaustion requirement that

---

[4] Plaintiff's one-sentence argument on this point references a New York state-court decision that involved interpretation of New York's civil procedure rules. *See* Pl's Opp. at 12 (citing *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D. 2d 50, 58 (N.Y. App. Div. 1988)). But this Court applies federal procedural rules. *See, e.g.*, *Hanna v. Plumer*, 380 U.S. 460, 471 (1965). So setting aside whether *Apple Records* accurately characterized New York's procedural requirements, those requirements have no bearing here.

the owner must satisfy before suing to enforce ownership rights.").[5]  In accordance with that requirement, a "properly plead[ed] copyright infringement claim must allege," among other things, "which specific original works are the subject of the copyright claim" and "that the [purportedly infringed] copyrights have been registered in accordance with the [copyright] statute."  *Zuma Press, Inc. v. Getty Images (US), Inc.*, No. 16-cv-6110, 2017 WL 2829517, at *2 (S.D.N.Y. June 29, 2018) (quoting *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992)).  If a complaint fails to distinguish registered works from non-registered works, moreover, courts in this circuit typically dismiss the copyright claim in its entirety while giving the plaintiff leave to replead it, given that a court is left "unable to distinguish the Plaintiff's allegations based upon the registered copyrights versus the unregistered copyrights."  *Adlife Mktg. Comm'cns Co., Inc. v. Best Yet Mkt., Inc.*, No. 2:17-cv-2978, 2017 WL 4564763, at *5 (E.D.N.Y. Oct. 11, 2017); *see also, e.g., Manhattan Rev. LLC v. Yun*, No. 16-cv-0102, 2016 WL 6330474, at *5 & n.8 (S.D.N.Y. Aug. 15, 2016), *report & recommendation adopted*, 2016 WL 6330409 (Oct. 26, 2016).

Those rules require dismissal of Plaintiffs' copyright infringement claim.  In their complaint, Plaintiffs state that McKenzie-Morris holds "copyright ownership rights" in certain works either through a "valid Certificate of Copyright Registration issued by the Register of Copyrights . . . *and/or* . . . [through] a valid recording/publishing agreement related to [this] action."  FAC ¶ 147 (emphasis added).  In other words, Plaintiffs allege that McKenzie-Morris has registered *some* of the works at issue in this case with the Register of Copyrights, but not all; the complaint does not further separate the registered works from the non-registered works.  The Court accordingly cannot determine which copyrighted works Plaintiffs may pursue infringement claims for, and must dismiss the claim in its entirety.  *See Adlife Mktg.*, 2017 WL 4564763, at *5.

---

[5] The exceptions to this rule include a "preregistration" process that allows earlier suit for certain types of works, or a suit for infringement of a live broadcast, which may commence before registration has been made.  *Fourth Estate*, 139 S. Ct. at 888; 17 U.S.C. §§ 408(f), 411(c).  Neither party argues that either exception is relevant here.

Plaintiffs' argument that registration is not a prerequisite to copyright suits for injunctive relief, Pl's Opp. at 3, is plainly wrong. Plaintiffs' single case in support of that view—a twenty-year-old district-court case from the Eighth Circuit, *Walker Mfg., Inc. v. Hoffman, Inc.*, 220 F. Supp. 2d 1024, 1039 (N.D. Iowa 2002)—conflicts with the clear language of the copyright statute, which makes registration a prerequisite to all copyright claims outside of enumerated exceptions not relevant here. *See* 17 U.S.C. § 411(a) (noting that except for certain exceptions not involving injunctive relief, "*no* civil action infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made" (emphasis added)). And the Supreme Court recently resolved any possible doubts on this point by noting that a "copyright owner may . . . seek an injunction barring the infringer from continued violation of her exclusive rights and an order requiring the infringer to destroy infringing materials" only "[o]nce the Register grants or refuses registration." *Fourth Estate*, 139 S. Ct. at 891.[6] In short, because the complaint fails to clearly identify McKenzie-Morris's works that have been registered with the Copyright Office, the Court must dismiss the copyright claim in its entirety.

## C. Seventh, Ninth, and Tenth Causes of Action: Unjust Enrichment, Conversion, and Tortious Interference

Defendants argue that three of Plaintiffs' claims—unjust enrichment, conversion, and tortious interference—are preempted by the Copyright Act. *See* Defs' Mem. at 16–19. The Court agrees that Plaintiffs' unjust enrichment and conversion claims are preempted and must be dismissed on that basis. Plaintiff's tortious interference claim, however, is not preempted. Nonetheless, because Plaintiff has failed to sufficiently plead the elements of that claim, it must be dismissed as well.

---

[6] By presenting an argument that is plainly foreclosed by Supreme Court precedent, counsel for Plaintiffs again risks sanctions under Federal Rule of Civil Procedure 11. *See* Dkt. No. 66.

### i.   Preemption Under the Copyright Act

"The Copyright Act exclusively governs a claim"—and non-Copyright Act claims are preempted—"when (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Universal Instruments Corp. v. Micro Sys. Eng'g*, 924 F.3d 32, 48 (2d Cir. 2019).  If it is "evident from the face of the complaint" that a purported claim is preempted, the preemption doctrine can be raised as an affirmative defense and "support a motion to dismiss." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 300 (2d Cir. 2022) (quoting *Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 28 (2d Cir. 2015)).  Because Copyright Act preemption turns on the nature of the work and rights at issue, "[t]he relevant question" for preemption purposes is "not whether [Plaintiffs] will ultimately prevail on their copyright claim," or even whether they bring such a claim, but rather "whether Plaintiffs *could* bring their claims under the copyright law at all." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 137 n.31 (S.D.N.Y. 2015) (internal citation omitted) (emphasis in original).

In articulating the two-step preemption formula that applies to copyright preemption, the Second Circuit has "referred to the first prong of [the] test as the 'subject matter' requirement and the second prong as the 'general scope' or 'equivalence' requirement." *Melendez*, 50 F.4th at 301. "The subject matter requirement of the test is satisfied when the plaintiff's 'claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works.'" *Id.* (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004)).  And "[f]or the general scope requirement of the test to be satisfied, 'the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law.'" *Id.* (quoting *Briarpatch*, 373 F.3d at 305).  So if the state

law claim involves "acts of reproduction, adaptation, performance, distribution, or display"—the exclusive rights protected by federal copyright law—and does *not* "include any extra elements that make it qualitatively different from a copyright infringement claim," then preemption applies. *Id.* at 302 (quoting *Briarpatch*, 373 F.3d at 305). The Second Circuit has emphasized the importance of the word "qualitatively": Courts are not to perform a "mechanical search for extra elements"; instead, they are to "engage in a holistic evaluation of the nature of the 'rights sought to be enforced' and then make 'a determination whether the state law action is *qualitatively* different from a copyright infringement claim.'" *Id.* (quoting *In re Jackson*, 972 F.3d 25, 44 n.17 (2d Cir. 2020) (emphasis in original)); *see also Briarpatch*, 373 F.3d at 306 ("[W]e take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim.").

### ii.   Unjust Enrichment and Conversion Claims

As pleaded, Plaintiffs' unjust enrichment and conversion claims are both preempted by the Copyright Act and must be dismissed. The "subject matter" of both of those claims are the masters, albums, compositions, and recordings made by McKenzie-Morris. *See* FAC ¶¶ 206–213 (unjust enrichment claim); *id.* ¶¶ 231–235 (conversion claim).[7] Those musical recordings undoubtedly "fall[ ] within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103,"

---

[7] Plaintiffs' opposition to the motion to dismiss sets out the conversion of the recordings themselves, rather than conversion of the royalties derived from the records, as the theory upon which their conversion claim is predicated. *See* Pl's Opp. at 7–8. The FAC, however, can be read to accuse Defendants of conversion of royalties, rather than conversion of the recordings themselves. *See* FAC at ¶¶ 232, 234–35. But to the extent that conversion of royalties, rather than conversion of records, underlies Plaintiffs' conversion claim, the claim is nonetheless barred because it is impermissibly duplicative of Plaintiffs' breach of contract claims. *See, e.g.*, *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 456 (S.D.N.Y. 2014) ("[C]onversion claims are routinely dismissed on Rule 12(b)(6) motions where duplicative of breach of contract claims."); *Drum Major Music Ent. v. Young Money Ent., LLC*, No. 11-cv-1980, 2012 WL 423350, at *4 (S.D.N.Y. 2012) (dismissing a conversion claim based on a failure to pay royalties because under New York law, "a conversion action cannot be predicated on . . . a mere breach of contractual obligation" (internal citation omitted)); FAC ¶¶ 113–116 (Plaintiffs' predicating their breach of contract claim on a failure to pay royalties); *id.* ¶¶ 121–126 (same); *id.* ¶¶ 131–136 (same).

*Universal Instruments Corp.*, 924 F.3d at 48, so the first prong of the preemption test is satisfied. *See* 17

U.S.C. § 102(a)(2) (protecting "musical works").

The second prong is also satisfied because Plaintiffs' unjust enrichment and conversion

"claim[s] seek[ ] to vindicate legal or equitable rights that are equivalent to one of the bundle of

exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Universal Instruments*

*Corp.*, 924 F.3d at 48. Specifically, for both unjust enrichment and conversion, "unauthorized

publication is the gravamen of [Plaintiffs'] claim[s]," so "it is clear that the right they seek to protect

is coextensive with an exclusive right already safeguarded by the [Copyright] Act—namely, control

over reproduction and derivative use of copyrighted material." *Harper & Row Publishers, Inc. v. Nation*

*Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 359 (1985). Plaintiff does not

point to any specific elements of her state-law unjust enrichment or copyright claims that would

make them "qualitatively different" than the rights against unauthorized publication protected by the

Copyright Act. *See Melendez*, 50 F.4th at 302. Instead, she points to out-of-circuit cases that have

found unjust enrichment claims not preempted, *see Chalfant v. Tubb*, 453 F. Supp. 2d 1308, 1321

(N.D. Okla. 2006); *G.S. Rasmussen & Assocs. v. Kalitta Flying Serv.*, 958 F.2d 896, 904 (9th Cir. 1992),

and one Second Circuit case that suggested in dicta that some conversion claims might not be

preempted (even as the one at issue in that case was preempted), *see Harper & Row*, 723 F.2d at 200.

That is insufficient: At most, those cases suggest that *some* unjust enrichment or conversion claims

are not preempted by the Copyright Act. They do not suggest—as necessary—that *Plaintiffs'* claims

are not preempted, because Plaintiffs do not show how they are attempting to vindicate a legal right

different than the right to access and reproduce copyrighted material. Accordingly, Plaintiffs' unjust

enrichment and conversion claims are dismissed as preempted by the Copyright Act.[8]

---

[8] Plaintiffs' most substantial articulation of how their facts undergird either claim relies on statements, in McKenzie-Morris' supplemental affirmation, to support the conversion claim. *See* Pl's Opp. at 7–8. Without determining whether

### iii.   Tortious Interference Claim

Unlike Plaintiffs' unjust enrichment and conversion claims, their tortious interference claim is not preempted.  While it is true that Plaintiffs' tortious interference claim is partially based on Defendants' purportedly unauthorized use of recordings and withholding of royalties, *see* FAC ¶ 242, those facts are not the gravamen of this claim.  Instead, Plaintiffs claim that Defendants interfered with both existing and prospective business relationships not only through their copying of McKenzie-Morris's records, but also by "holding [themselves] out as the lawful copyright owner" of certain songs, and "[m]aking false, misleading and disparaging representations that [they] were authorized to negotiate on behalf of McKenzie for the Masters, Albums, Compositions, and/or Recordings."  FAC ¶¶ 238, 242.  These allegations of conduct "other than infringement"— essentially, fraudulent representations made to third parties—makes Plaintiffs' tortious interference claim qualitatively different from and not preempted by the Copyright Act, which does not cover such activities.  *See Dyer v. V.P Recs. Retail Outlet, Inc.*, No. 05-cv-6583, 2008 WL 2876494, at *5 (S.D.N.Y. 2008).

Nonetheless, this claim must be dismissed because, as pleaded, it fails to state a valid cause of action.  Plaintiffs' complaint appears to allege tortious interference with both present and prospective business relationships.  *See* FAC ¶ 238 (alleging interference with Plaintiffs' "valid contracts"); *id.* ¶¶ 239–241 (alleging interference with Plaintiffs' "ability to establish new business relationships with third parties").  In New York, the elements of tortious interference with an existing contract are "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages

---

those facts in tandem with those contained in the FAC would have adequately stated a conversion claim, the Court again notes that it is precluded from considering McKenzie-Morris's supplemental affidavit.  *See* Part IV(A), *supra*.

resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (internal

quotation omitted) (alterations in original).  And "[t]o prevail on a claim for tortious interference

with business relations—also known as tortious interference with prospective economic advantage

. . . under New York law, a plaintiff must show that '(1) the plaintiff had business relations with a

third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a

wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured

the relationship.'" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quoting *Catskill*

*Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 247, 261 (2d Cir. 2015)).

Plaintiff has failed to satisfactorily plead the first element of tortious interference of an

existing contract.  Under New York law, "as a rule, conclusory allegations of interference with an

unspecified contract are insufficient to plead tortious interference." *Lesesne v. Brimecome*, 918 F. Supp.

2d 221, 227 (S.D.N.Y. 2013); *see also Leadsinger, Inc. v. Cole*, No. 05-cv-5606, 2016 WL 2320544, at *12

(S.D.N.Y. Aug. 10, 2006) (dismissing a claim that "failed to allege the relevant terms of the contracts

that existed" and collecting federal and state court cases dismissing claims for the same reason);

*Iqbal*, 556 U.S. at 678 (noting that "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements" are not sufficient to state a claim).  In the FAC, Plaintiffs

allege that they "have valid contracts, not only with each other, but between themselves, individually,

and third parties, including contracts with songwriters and publishers listed in Exhibit 'A' and

Exhibit 'B.'"  FAC ¶ 238.  But Exhibit A appears to be a table of royalty payments, while Exhibit B

is a list of songs.  *See* FAC Exs. A–B.  And Plaintiffs do not further explain those tables or any other

existing contract in their opposition, instead choosing to fully focus on alleged interference with

prospective business relations.  *See* Pl's Opp. at 8–9.  Without additional explanation of the terms of

the existing contracts between Plaintiffs and third parties, Plaintiffs cannot sustain any claim for

tortious interference with an existing contract.

Plaintiffs have also failed to plead tortious interference with business relations because they have not shown that Defendants acted for a wrongful purpose or used dishonest, unfair, or improper means.  *16 Casa Duse*, 791 F.3d at 262.  The "wrongful means element" for this tort "sets a high bar":  "a claim for tortious interference with business relations requires a plaintiff to show, as a general rule, that the defendant's conduct . . . amount[ed] to a crime or an independent tort" or that the defendant "engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs."  *Id.* (internal citations omitted).  Plaintiffs allege the Defendants "interfered with [McKenzie-Morris's] ability to establish new business relationships with third parties, such as Sony Music/ATV and Warner Music Group."  FAC ¶ 241.  And Plaintiffs alleged that Defendants did so by "(i) Making false, misleading, and disparaging representations that Defendants were authorized to negotiate on behalf of McKenzie for the Masters, Albums, Compositions and/or Recordings; (ii) Failing to provide McKenzie with a proper accounting; and (iii) Continuing to market and sell the Masters, Albums, Compositions and/or Recordings after the Royalty Agreements were terminated."  FAC ¶ 242.  Plaintiffs, however, have failed to directly connect these factual statements to any independent tort, as opposed to violations that would sound in breach of contract.  *See Lavazza Premium Coffees Corp. v. Prime Line Distributors, Inc.*, 575 F. Supp. 3d 445, 471 (S.D.N.Y. 2021) (noting that tortious interference claims should be dismissed "where a plaintiff seeks to assert a tortious-interference claim against the same party that allegedly breached its contract, and where the plaintiff's tort allegations are based on the same conduct as that which gave rise to the alleged contract breach").  Nor have Plaintiffs pleaded any facts to plausibly allege that Defendants acted with the sole purpose to harm Plaintiffs, as opposed to their own economic self-interest.  *See 16 Casa Duse*, 791 F.3d at 262 (noting that where a defendant acts for "normal economic self-interest, wrongful means have not been shown").  Accordingly, Plaintiffs have not plausibly alleged either

tortious interference with an existing contract or tortious interference with business relations, requiring dismissal of their tortious interference claim.

### D.  Sixth Cause of Action:  Fraud

Plaintiffs have sufficiently pleaded a cause of action for fraud against VP Records.  "Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015).  And under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

The allegations in the complaint sufficiently plead each element of a fraud claim against VP Records.  Plaintiffs identify a specific material misrepresentation made by VP Records:  that, "in an email exchange on or about October 13, 2008," Olivier Chastan—then the Executive Vice President of VP Records, *see* FAC ¶ 56—"represented that VP Records did not administer Greensleeves Publishing in the USA."  FAC ¶ 186.  Plaintiffs also state that this representation was made "knowingly."  FAC ¶ 186–187.  They further allege that VP Records intended to induce McKenzie-Morris "to rely on the independence of GPL as a separate, distinctive entity with which she would be contracting business" and that "but for this material misrepresentation, McKenzie would not have entered into the GPL Songwriter Agreement."  FAC ¶ 187.  Finally, Plaintiffs have alleged damages in the form of lost royalties under that contract.  FAC ¶ 83.[9]

---

[9] These "allegations of intentional fraud," though they have to do with one of the contracts at issue in their contract claims, nonetheless are not "merely redundant" of that claim because they reflect "claims of fraudulent misrepresentations made by defendants which *induced* them to enter into the contract," as opposed to purported actions taken by Defendants in breaching the contract.  *Gizzi v. Hall*, 754 N.Y.S. 2d 373, 376 (N.Y. App. Div. 2002) (emphasis added).

Defendants do not deny that these allegations satisfy the elements of a fraud claim. Instead, they offer two counterarguments that, they say, preclude a fraud claim notwithstanding these facts—but both are unavailing. First, Defendants allege that other emails from the "email exchange" relied upon by Plaintiffs "eviscerate[ ] Plaintiffs' misrepresentation claim" because they show that Plaintiffs "understood VP and Greensleeves have common control" before execution of the GPL Songwriter Agreement, and that Plaintiffs therefore could not have justifiably relied on any supposed misrepresentations made by Mr. Chastan. Defs' Mem. at 9 (internal citation omitted). But the emails referenced by Defendants cannot be considered at this juncture. "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (internal quotation omitted). Here, while Defendants seize upon the term "email exchange" to imply that Plaintiffs have referenced more than one email, the only "clear, definite and substantial reference" in Plaintiffs' complaint is to the purported statement by Mr. Chastan concerning VP Records' non-administration of GPL. *See* FAC ¶ 186. While Defendants will, of course, be able to introduce evidence to counter Plaintiffs' allegations after the motion-to-dismiss stage, permitting consideration of that evidence now would violate "the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is the master of the complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987).[10]

---

[10] Defendants' cited cases are not to the contrary. *See* Defs' Mem. at 9 n.5. They each dealt with complaints that clearly and unambiguously referenced the incorporated documents, and thus are inapposite to the situation here. *See Scalercio-Isenberg v. Morgan Stanley Servs. Grp. Inc.*, No. 19-cv-6034, 2019 WL 6916099, at *2 (S.D.N.Y. Dec. 19, 2019) (incorporating by reference emails that were referred to directly in the plaintiff's complaint); *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 331–32 (S.D.N.Y. 2015) ("When the document reflects a factual issue (such as an email correspondence) and the complaint *specifically refers to the contents of the e-mail communication*, the Court can 'deem the e-mail incorporated in the complaint and therefore subject to consideration in its review of the adequacy of the [allegations in the] complaint.'" (quoting *DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (emphasis added) (alteration in original))). Finally, the Court's decision not to view Defendants' proffered emails as incorporated by reference into Plaintiffs' complaint does not reflect any substantive position on whether those emails, if considered, would in fact "eviscerate[ ]" Plaintiffs' fraud claim. Defs' Mem. at 9.

Finally, Defendants argue that "Plaintiffs' failure to specify alleged fraudulent conduct on a defendant-by-defendant basis independently requires dismissal of Plaintiffs' claim." Defs' Mem. at 12; *see, e.g.*, *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 213 (S.D.N.Y. 2019) (describing the "group pleading doctrine," under which "'[s]weeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)'" (citing *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 579–80 (2d Cir. 2005))). But the complaint notes that the four VP Defendants are referred to collectively in the complaint as "VP Records," FAC at 1, states that Mr. Chastan was the "Executive Vice President of VP Records from 2004–2012," FAC ¶ 56, and makes its fraudulent misrepresentation allegations against "Defendant VP Records," FAC ¶ 186. Drawing all inferences in Plaintiffs' favor as it must, *see Burch*, 551 F.3d at 124, the Court reads these statements to allege that Mr. Chastan was the Executive Vice President of each of the VP Records-related entities in this action, and that each of those defendants is accordingly responsible for the alleged fraud. Plaintiffs have therefore properly alleged fraud against VP Records.

Plaintiffs' fraud claim, however, must be dismissed against GPL. Plaintiffs do not allege that GPL is responsible for Mr. Chastan's alleged misrepresentations. *See* FAC ¶ 186. And the allegations of fraud they do make against GPL do not suffice to state a claim.

Plaintiffs first allege that GPL "materially misrepresented the date on which the GPL Songwriter Agreement was in fact made and/or entered into by both parties" because it contained an "as of" date that made the contract effective as of December 1, 2007, even though it was still being negotiated in late 2008. FAC ¶ 185. But as Defendants note, "as of" dates are common and uncontroversial contractual provisions; a party who signs a contract with an "as of" date is presumed to agree to it and may be bound accordingly. Defs' Mem. at 8; *see U.S. Bank, N.A. v. Squadron VCD, LLC*, No. 10-cv-5484, 2011 WL 4582484, at *5 (S.D.N.Y. Oct. 3, 2011) ("[I]t is fundamental that

where parties to an agreement expressly provide that a written contract be entered into 'as of' an earlier date than that on which it was executed, the agreement is effective retroactively 'as of' the earlier date and the parties are bound thereby accordingly." (quoting *Colello v. Colello*, 780 N.Y.S. 2d 450, 453 (N.Y. App. Div. 2004))).  So absent any allegation that the provision was inserted *after* McKenzie-Morris signed the agreement, Plaintiffs' argument that it was "improper and fraudulent" because McKenzie-Morris "did not consent to the backdating of the GPL Songwriter Agreement," Pl's Opp. at 6, is inaccurate.

Plaintiffs' remaining allegations against GPL (and VP Records) must be dismissed as either duplicative of the contract-based claims or insufficiently pleaded.  "New York law bars fraud claims that 'arise[ ] out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties.' . . .  In such circumstances, 'the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.'"  *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 410–11 (S.D.N.Y. 2016) (quoting *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001)).  In their complaint, Plaintiffs allege that "Defendants' wanton disregard of their obligations" under the applicable contracts "emanates from their preconceived and undisclosed intention of not performing them and of continuing their dishonest accounting schemes . . . that have deprived Plaintiffs of millions of dollars in royalties."  FAC ¶ 188.  But that allegation echoes Plaintiffs' contract-based complaints, *see* FAC ¶¶ 113–116, 121–126, 131–136, and therefore cannot form the basis of a separate fraud claim.

Moreover, to meet Rule 9(b)'s pleading standard, a fraud claim must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988

F.3d 157, 167 (2d Cir. 2021)).  Plaintiffs' remaining scattershot allegations—that "Defendants falsified documents by disseminating underreported royalties, utilize[ed] improper rates and prices, hid[ ] lucrative side deals with third parties, [sold] bootleg copies of McKenzie's music, exploit[ed] the Masters, Albums, Compositions, and/or Recordings without permission, and generally us[ed] evasive tactics to conceal information," FAC ¶ 189—thus do not come close to meeting Rule 9(b)'s requirements.  The Court cannot tell, from these generalized pleadings, exactly what it is that Defendants are accused of doing, nor whether those actions would be sufficiently distinct from actions alleged in Plaintiffs' breach-of-contract claims to permit the pleading of a fraud claim alongside contract-based claims.  *See Almeciga*, 185 F. Supp. 3d at 410–11.  In sum, as Plaintiffs have not sufficiently stated a fraud claim outside of Mr. Chastan's alleged misrepresentation, they have failed to state that claim against GPL.

### E.  Eighth Cause of Action:  Breach of Fiduciary Duty

Plaintiffs' complaint fails to adequately plead that Defendants breached a fiduciary duty that they owed to Plaintiffs.  "A claim for breach of fiduciary duty under New York law requires the existence of a fiduciary duty and a breach of that duty."  *Faulkner v. Arista Recs., LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009).  "A fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."  *Id.* (quoting *Cooper v. Sony Recs. Int'l*, No. 00-cv-233, 2001 WL 1223492, at *5 (S.D.N.Y. Oct. 15, 2001)).  And because a fiduciary relationship exists between two parties is a "necessarily fact-specific" question, *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.E. 2d 735, 740 (N.Y. 2012) (quoting *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E. 2d 26, 19 (N.Y. 2005)), it is often one that a jury must decide.  *See CBS, Inc. v. Ahern*, 108 F.R.D. 14, 26 & n.21 (S.D.N.Y. 1985).

Nonetheless, courts have established certain pleading thresholds that a plaintiff must satisfy to plausibly allege the existence of a fiduciary relationship. To start, simply demonstrating a business relationship between two parties is insufficient to plead the existence of a fiduciary relationship because "[a] fiduciary relationship is . . . 'grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions.'" *Oddo Asset Mgmt.*, 19 N.E. 2d at 740 (quoting *EBC I*, 832 N.E. 2d at 31). For that reason, absent any alleged "'special circumstances,' courts have routinely held that 'no fiduciary relationship exists between a music publisher and composer as a matter of law.'" *Faulkner*, 602 F. Supp. 2d at 482 (quoting *Cooper*, 2001 WL 1223492, at *5); *see also id.* ("The fact that a defendant record company is contractually responsible for collecting royalties and passing them on to a plaintiff music artist does not, in itself, create a fiduciary relationship between parties."). Nor are "conclusory allegations that a contractually-bound record company and recording artist shared a long and enduring relationship . . . of trust and confidence" sufficient special circumstances to plead the existence of a fiduciary duty. *Id.* (internal quotation omitted) (alteration in original). Instead, to plausibly allege a fiduciary duty, a plaintiff must state *facts* that—taken together—adequately suggest that the parties engaged in "a long enduring relationship . . . borne a special relationship of trust and confidence" that "existed independent of the contractual duties." *Apple Recs., Inc. v. Capitol Recs., Inc.*, 529 N.Y.S. 2d 279, 283 (N.Y. App. Div. 1988). And while courts look to the contract between parties to understand "the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency," *EBC I*, 832 N.E. 2d at 31, "the focus" for purposes of a breach of fiduciary duty claim "is on whether a *noncontractual* duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement." *Apple Recs.*, 529 N.Y.S. 2d at 282 (emphasis added).

Here, Plaintiffs' pleadings do not plausibly allege that Defendants breached a noncontractual fiduciary duty.  The "special circumstance," *Faulkner*, 602 F. Supp. 2d at 482, that Plaintiffs raise in the FAC as one that created a fiduciary duty is the following:  "Defendants VP Records and GPL acting as their administrator in connection with Masters, Albums, Compositions and/or Recordings that were not subject to any contract between the Defendants and Plaintiffs and continuing to administer those Masters, Albums, Compositions and/or Recordings after their rights to act in such capacity terminated pursuant to their respective agreements."  FAC ¶ 228.  But Defendants' responsibility to administer the recording agreements is one that arose under the contracts at issue in this case.  *See, e.g.,* FAC Ex. C ¶ 5.1 (making recordings under the May 2007 VP Records agreement "entirely the property" of VP Records); FAC Ex. F ¶ 23 (December 2007 GPL contract, wherein GPL was given the right to "exclusively administer[ ]" the compositions at issue in the contract). So—as Plaintiffs acknowledge—Defendants' fiduciary duty must come from another source.  *See* Pl's Opp. at 10 ("[T]here must be some other relation not created by the contract alone, from which sprang the duty which was violated." (quoting *Rich v. N.Y. Cent. & Hudson Riv. R.R. Co.*, 87 N.Y. 382, 395–96 (1882)).

In their opposition papers, Plaintiffs seek to show the existence of a fiduciary duty by pointing to (1) on the sixteen-year relationship between themselves and VP Records, and (2) an alleged partnership between themselves and GPL.  *Id.* at 10–11.[11]  But courts have repeatedly rejected similar and even longer relationships between recording artists and record labels as

---

[11] The other facts that Plaintiffs point to do not help establish a fiduciary duty on the part of the Defendants.  First, Plaintiffs describe how Defendants allegedly "betrayed by fraud" the parties' "special relationship."  Pl's Opp. at 10–11. But these actions, if true, speak to Defendants' alleged *breach* of a fiduciary duty; they cannot establish a duty in the first place.  Second, Plaintiffs note that there is an "implied covenant of good faith and fair dealing [and] a 'legal common-law duty extraneous to the contract not to act willfully to destroy the property of another.'"  *Id.* at 11 (quoting *Apple Recs.*, 529 N.Y.S. 2d at 282).  Both the implied covenant of good faith and fair dealing and the common-law duty not to willfully destroy another's property, however, are separate causes of action from a breach of fiduciary duty, and so cannot help Plaintiffs state a fiduciary duty claim.  *See Apple Recs.*, 529 N.Y.S. 2d at 282–83 (separating out various tort claims that can, in certain circumstances, be brought alongside contract claims).

insufficient to state a claim for fiduciary duty.  *See, e.g.*, *Faulkner*, 602 F. Supp. 2d at 473–76, 484 (dismissing a fiduciary duty claim where the plaintiffs and defendants shared an over-thirty-year relationship); *Cooper*, 2001 WL 1223492, at *1–2, *5 (dismissing a fiduciary duty claim where the plaintiffs and defendants shared a seventeen-year-long relationship).  And while Plaintiffs are correct that partnerships are fiduciary relationships, *see Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928), the contention that Plaintiffs were partners with GPL because they co-owned certain compositions is inaccurate:  That arrangement made them co-owners of property, not partners.  *See* N.Y. P' Ship § 10(1) ("A partnership is an association of two or more persons to carry on as co-owners a business for profit.");  *Saibou v. Alidu*, 130 N.Y.S. 3d 387, 388 (N.Y. App. Div. 2020) ("A mutual promise or undertaking of the parties to share in the profits of the business as well as the burden of the losses is an indispensable element of a partnership.").  These facts do not plausibly assert that Defendants owed Plaintiffs a fiduciary duty outside of the parties' contractual responsibilities.

Finally, given the thin assertions undergirding Plaintiffs' assertion of a fiduciary duty on the part of the Defendants, any analogy to *Apple Records* is inapposite.  *See* Pl's Opp. at 10–11 (Plaintiffs relying primarily on *Apple Records* to establish their breach of fiduciary duty claim).  *Apple Records* involved not only a decades-long relationship between an artist (The Beatles) and a record label (Apple Records), but also facts that demonstrated a remarkable interconnectedness between the two—including that during the relationship, The Beatles went from relative unknowns to global superstars, and that "at one point the Beatles constituted 25 to 30 percent of [Apple Records'] business." 529 N.Y.S. 2d at 283.  Given the absence of facts here like the *sui generis* ones in *Apple Records*, reference to that case cannot salvage Plaintiffs' fiduciary duty claim.  *See Faulkner*, 602 F. Supp. 2d at 483–84 & n.3 (stating that "given the unprecedented facts of that case, *Apple Records* stands as the exception to the general rule that a fiduciary relationship does not exist between recording artists and their record companies under New York law, and thus is of little precedential

value to these or other plaintiffs," and rejecting a breach of fiduciary duty claim with facts more analogous to *Apple Records* than those here).

### F. Eleventh and Thirteenth Causes of Action:  Accounting and Imposition of a Collective Trust

The parties agree that, because the existence of a fiduciary relationship between the parties is a mandatory element of causes of action for accounting and imposition of a collective trust, whether those claims have been properly pleaded turns on the parties' fiduciary relationship.  *See* Defs' Mem. at 22 ("Plaintiffs' accounting and constructive trust claims fail because (i) the existence of a fiduciary relationship is a mandatory element of each of these causes of action, and . . . Plaintiffs have not pleaded . . . the existence of a fiduciary relationship."); Pl's Opp. at 11 ("[A]s Plaintiffs have properly pled the presence of a fiduciary duty between McKenzie and Defendants VP Records and GPL, the basis for dismissal [of the accounting and imposition of a collective trust claims] is moot.").  Having found that Plaintiffs have failed to plead the existence of a fiduciary duty, *see supra* Part IV(E), the Court dismisses Plaintiffs' eleventh and thirteenth claims.

### G. Twelfth and Fourteenth Causes of Action:  Declaratory Judgment and Permanent Injunction

Finally, the Court will not grant Plaintiffs either a declaratory judgment or a permanent injunction.  Both declaratory judgments and permanent injunctions are forms of relief, not independent causes of action.  *See Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997) (noting that the Declaratory Judgment Act "is procedural in nature, and merely offers an additional remedy to litigants); *Roller v. Red Payments L.L.C.*, No. 19-cv-5285, 2022 WL 4226094, at *8 (E.D.N.Y. Sept. 12, 2022) ("[I]t is well settled that a request for injunctive relief is not a separate cause of action." (internal citation omitted)).  In their motion to dismiss, Defendants argue that Plaintiffs are not entitled to either form of relief because (1) any declaratory-judgment relief is duplicative of Plaintiffs' substantive causes of action, and (2) Plaintiffs have failed to state the

elements required to entitle themselves to a permanent injunction. Defs' Mem. at 12 (citing *Premier Med. Sys., LLC v. NeuroLogica Corp.*, No. 1:21-cv-1337-GHW, 2022 WL 603999, at *9 (S.D.N.Y. Feb. 28, 2022) (Woods, J.) ("Here, Plaintiff's rights will be adjudicated through its breach of contract and quantum meruit claims, rendering duplicative its claim for declaratory judgment.")); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (noting that a plaintiff seeking a permanent injunction must allege "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction" (internal citation omitted)).

In their opposition papers, Plaintiffs respond by simply asserting that "proper plea for declaratory judgment and a permanent injunction would settle the controversy and serve a useful purpose in clarifying the legal relations at issue." Pl's Opp. at 11–12. That response—along with Plaintiffs' equally thin factual recitations in the relevant sections of its amended complaint, *see* FAC ¶¶ 257–260, 264–268—fails to grapple with the law applicable to declaratory judgments and permanent injunctions, and is accordingly insufficient to preclude dismissal of these claims.

## V.    LEAVE TO AMEND

"It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). It is true that leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal citation omitted). But none of those conditions apply here: the Court cannot conclude that a further amendment of the complaint would be futile. And Plaintiff has not yet had the opportunity

to amend the complaint with the benefit of a ruling from the Court.  "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."  *Loreley Fin.*, 797 F.3d at 190. Plaintiff is therefore granted leave to file an amended complaint to address the deficiencies identified in this order no later than 14 days from the date of this order.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 26.

SO ORDERED.

Dated:  December 30, 2022

_____
GREGORY H. WOODS
United States District Judge