UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHAUNA MCKENZIE-MORRIS,

                              Plaintiff,

              -against-

V.P. RECORDS RETAIL OUTLET, INC., et
al.,

                              Defendants.

---

22-CV-1138 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Shauna McKenzie-Morris brings this action against various record labels, distributors, and publishers: V.P. Records Retail Outlet, Inc., V.P. Music Group, Inc., V.P. Record Distributors, LLC, V.P. Records of Brooklyn, LLC, Greensleeves Publishing, Ltd, and STB Music Inc. (collectively, "Defendants"). She alleges that they breached contracts that they had entered into by, among other things, failing to pay McKenzie-Morris royalties that she was owed, improperly including certain recordings on albums, and improperly registering certain musical compositions. While discovery was ongoing, Defendants filed a motion for partial summary judgment claiming that Plaintiff filed several of her claims too late.

Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part. The Court GRANTS Defendants' motion as to Plaintiff's first cause of action, relating to the 2007 Recording Agreement, because it is barred to the extent Plaintiff did not timely send specific written objections and file a lawsuit. Additionally, the Court GRANTS Defendants' motion as to Plaintiff's claim that Defendants improperly included recordings on albums released in 2008 and 2011 and Plaintiff's claim that Defendants improperly registered musical compositions, because those claims are time-barred. However, the Court DENIES Defendants' motion as to Plaintiff's third cause of action relating to the 2014 Co-Publishing Agreement,

because there is a genuine issue of material fact as to whether certain communications constitute specific written objections. Defendants' motion is also DENIED without prejudice as to Plaintiff's second cause of action, relating to the 2007 Songwriter Agreement, because it concerns issues that may be based in English law that Defendants have not briefed. The Court also DENIES Defendants' motion to amend their answer to add counterclaims because of the prejudice Plaintiff would face and DENIES Plaintiff's motion to amend her Third Amended Complaint as moot. Finally, the Court DENIES Defendants' motion to exclude Plaintiff's expert handwriting report, but GRANTS Defendants' motion to file a rebuttal expert report.

## BACKGROUND

The Court assumes the parties' familiarity with the facts of the case, as laid out by Judge Woods in his opinion that dismissed Plaintiff's copyright and fraud claims but kept Plaintiff's breach of contract claims. *See* ECF No. 123 at 2–8. The Court recites only those facts relevant to Defendants' motion for partial summary judgment. The following facts are taken from the parties' Federal Rule of Civil Procedure 56.1 statements and supporting materials, and are undisputed unless otherwise noted.

There are three contracts relevant to the claims in this action:

(1) a May 1, 2007 recording agreement between Plaintiff and V.P. Music Group, Inc. ("VP Music"),

(2) a December 1, 2007 songwriter agreement between Plaintiff and Greensleeves Publishing, Ltd. ("GPL"), and

(3) a March 20, 2014 co-publishing and administration agreement between Plaintiff and GPL.

*See* ECF No. 172 ("Defs. Mem.") at 3; ECF No. 170-1 ("2007 Recording Agreement"); ECF No. 171-1 ("2007 Songwriter Agreement"); ECF No. 171-5 ("2014 Co-Publishing Agreement," together with the 2007 Recording Agreement and the 2007 Songwriter Agreement, the "Agreements"). With their current motion, Defendants seek to narrow the scope of Plaintiff's breach of contract claims based, in part, upon the "incontestability" provisions in the Agreements. Defs. Mem. at 1.

Regarding royalty statements, the 2007 Recording Agreement provides:

Accountings as to royalties accruing or which otherwise would have accrued hereunder shall be made by Company to Artist on or before September 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st, or such other accounting periods as Company may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by Artist during such preceding half-year, less Advances or other non-recouped recoupable and/or deductible amounts hereunder. Company shall have the right to hold reasonable reserves in respect of sales hereunder, which reserves shall be fully liquidated over the next four (4) subsequent accounting periods.

2007 Recording Agreement § 8.1.

The 2007 Recording Agreement states that the royalty statements are binding unless Plaintiff makes a "specific objection in writing" within two years:

All royalty statements rendered by Company to Artist shall be binding upon Artist and are not subject to any objection by Artist for any reason unless specific objection in writing, stating the basis thereof, is given to Company within two (2) years from the date due. Failure to make specific objection within said time period shall be deemed an irrevocable approval of such statement.

*Id*. § 8.3. The 2007 Recording Agreement further states that Plaintiff is required to bring an action in connection with any royalty statements within two years from the date of such statement:

Artist will not have the right to bring an action against Company in connection with any royalty accounting or payments hereunder unless Artist commences the suit within two (2) years from the date such statement of accounting for royalties or such payment was due.

*Id*. § 8.5 (together with Section 8.3, the "2007 Recording Agreement Incontestability Clause").

The 2007 Recording Agreement also provides that it "is entered into in the State of New York

and shall be construed in accordance with the laws of New York applicable to contracts entered

into and to be wholly performed therein." *Id*. § 18.7.

The next contract at issue, the 2007 Songwriter Agreement, provides:

> Publisher shall compute the royalties earned by Writer pursuant to this Agreement and pursuant to any other agreement between Writer and Publisher or its affiliates, whether now in existence or entered into at any subsequent hereto, on or before March 31st for the semi-annual period ending the preceding December 31st and on or before September 30th for the semi-annual period ending the preceding June 30th, and shall thereupon submit to Writer the royalty statement for each such period together with the net amount of royalties, if any, which shall be payable after deducting any and all unrecouped advances and chargeable costs permitted under this Agreement or any such other agreement.

2007 Songwriter Agreement § 8. It additionally states:

> Each statement submitted by Publisher to Writer shall be binding upon Writer and not subject to any objection by Writer for any reason unless specific written objection, stating the basis thereof, is sent by Writer to Publisher within three (3) years after the date said statement is submitted.

*Id*. (the "2007 Songwriter Agreement Incontestability Clause"). The 2007 Songwriter Agreement

further provides that the 2007 Songwriter Agreement "shall be deemed to have been made in

England, and its validity, construction and effect shall be governed by the laws of England

applicable to agreements wholly performed therein." *Id*. § 17.

The 2014 Co-Publishing Agreement contains similar language as the 2007 Recording

Agreement and 2007 Songwriter Agreement:

> Publisher shall compute the royalties earned by Writer pursuant to this Agreement and pursuant to any other agreement between Writer and Publisher or its affiliates, whether now in existence or entered into at any subsequent hereto, on or before March 31st for the semi-annual period ending the preceding December 31st and on or before September 30th for the semi-annual period ending the preceding June 30th, and shall thereupon submit to Writer the royalty statement for each such period together with the net amount of royalties, if any, which shall be payable

after deducting any and all Unrecouped advances and chargeable costs under this
Agreement or any such other agreement.

2014 Co-Publishing Agreement § 9.1. It further provides:

Each statement submitted by Publisher to Writer shall be binding upon Writer and
not subject to any objection by Writer for any reason unless specific written
objection, stating the basis thereof, is sent by Writer to Publisher within two (2)
years after the date said statement is submitted.

*Id*. § 9.2 (the "2014 Co-Publishing Agreement Incontestability Clause," and together with the

2007 Recording Agreement Incontestability Clause and the 2007 Songwriter Agreement

Incontestability Clause, the "Incontestability Clauses"). The 2014 Co-Publishing Agreement also

states:

This Agreement has been entered into in the State of New York and the validity,
interpretation and legal effect of this Agreement shall be governed by the laws of
the State of New York applicable to contracts entered into and performed entirely
therein with respect to the determination of any claim, dispute or disagreement
which may arise out of the interpretation, performance, or breach of this
Agreement.

*Id*. § 16.

Under the 2007 Recording Agreement, the royalty statement covering the period from

January to June 2019 was due on or before September 30, 2019 (the "VP 1H 2019 Statement").

ECF No. 169 ("Defs. 56.1") ¶ 5. Defendants claim that in the two years following September 30,

2019 – up through September 30, 2021 – VP Music did not receive from Plaintiff any specific

written objections to that statement setting forth the basis for such objections. *Id*. ¶ 9. Defendants

also state that Plaintiff did not file a lawsuit claiming breach of the 2007 Recording Agreement

within two years of the VP 1H 2019 Statement. *Id*. ¶ 10.

The next royalty statement due under the 2007 Recording Agreement was for the period

from July through December 2019, and was due on or before March 31, 2020 (the "VP 2H 2019

Statement"). *Id*. ¶ 11. In the VP 2H 2019 Statement, the "previous period balance" is taken from

– and is the same number as – the "ending balance" in the VP 1H 2019 Statement. *Id*. ¶ 12. The VP 2H 2019 Statement then also sets forth the royalties and expenses reported from July through December 2019. *Id*. ¶ 13. Accordingly, the "ending balance" in the VP 2H 2019 Statement is directly derived from the VP 1H 2019 Statement, as it is composed of the "ending balance" from the VP 1H 2019 Statement along with the royalties and expenses reported from July through December 2019. *Id*. ¶ 15.

As to the 2007 Songwriter Agreement and 2014 Co-Publishing Agreement, Defendants contend that GPL sent the royalty statement covering the period from January through June 2018 ("GPL 1H 2018 Statement") on November 2, 2018 and that GPL's royalty statements to Plaintiff for these two agreements were submitted as a single document that included two discrete statements, with the first portion applying to the 2007 Songwriter Agreement and referring to Plaintiff with the artist number "38" and the second applying to the 2014 Co-Publishing Agreement and referring to Plaintiff with the artist number "427." *Id*. ¶¶ 23–24, 42. Plaintiff received this royalty statement over email and responded to the email with "Right!" *Id*. ¶ 29; ECF No. 171-3. Plaintiff contends that she responded in such a way "because plaintiff was already in dispute with the defendants since the converted statements were sent in 2012, in 2015 and beyond" and "in protest of the fraudulent statements being created by defendants." ECF No. 202 ("Pl. 56.1") at 27. She avers that she did not receive the GPL 1H 2018 Statement by email until 2020. *Id*. at 28.

Plaintiff alleges that she and her manager sent several emails and letters disputing royalty statements, since at least 2012. Pl. 56.1 at 13–14, 16, 25, 27 (claiming that Plaintiff "has always contended openly in writing to the representatives of the defendants that the statements are incorrect"); ECF No. 200-2. Plaintiff attaches several of these communications as exhibits in her

summary judgment materials. In a February 9, 2012 letter (the "February 9, 2012 Letter")
Plaintiff writes "after reviewing the statements there are some discrepancies with regards to the
mechanical rate and the cross collateralizing of the mechanical royalty applied. I look forward to
discussing further the corrections of these issue pursuant to my agreement with Greensleeves
Ltd." ECF No. 200-2. The subject line of this letter is "Greensleeves Publishing LTD –w- Shauna
McKenzie p/k/a Etana : Exclusive Songwriter Agreement." *Id*.

      In response to an October 6, 2015 email from GPL with Plaintiff's royalty statement
attached, Plaintiff sent an email (the "October 6, 2015 Email") including a screenshot of the
royalty statement that covered the period January 1, 2014 through June 30, 2014 and asking how
Greensleeves "manage[d] to add $4000." ECF No. 200-5 at 1–3.

      On February 14, 2017 Plaintiff's manager and husband, Andre Morris, sent an email to
VP Records (the "February 14, 2017 Email") stating, among other things, that it was regarding
an outstanding balance related to the licensing of a track. ECF No. 200-6 at 1. The email
additionally states that Plaintiff "is not aware of getting paid or compensated for the license of
this track to this product" and that this "track was exclusively done for the Strong One album."
*Id*. The email inquires "I've never seen this statement before and would like to see a receipt or
statement showing how you arrived at that balance, when was Etana paid and why does it seem
there is a [cross-collateralization] of her royalty earnings?" *Id*. Attached to the email is a
document entitled "shauna_mckenzie_304_ 4q2016_grs_artist_royalty_statements.pdf." *Id*.

      On August 7, 2019, Plaintiff's manager emailed VP Records (the "August 7, 2019
Email") stating that there should not be any cross-collateralization between the 2007 Recording
Agreement and the 2014 Co-Publishing Agreement, and that "I look forward to receiving the
corrected statement for the I Rise album with the all rates on the page attached." ECF No. 200-7

at 1. Plaintiff states that this email disputed a 2019 royalty statement. Pl. 56.1 at 14. An individual from VP Records responded to say that *I Rise* was part of the 2007 Recording Agreement. ECF No. 200-7 at 2. The parties sent additional emails disputing the terms under which the *I Rise* album was released. *Id*. at 3–5.

On November 20, 2020, Plaintiff's then-counsel sent an email (the "November 20, 2020 Email") alleging that VP Records was incorrectly interpreting the Agreements and that "VP is no longer Etana's publisher and *therefore* any assignment of rights [is] invalid." ECF No. 202-18 at 2–3. Specifically, the email stated that from November 30, 2012 to November 1, 2014, the parties were under no contractual obligation for recording services, and from December 1, 2012 to March 20, 2014, the parties were under no contractual obligation for songwriting and publishing administration. *Id*. at 3. Plaintiff characterizes this email as disputing the validity of the 2014 Co-Publishing Agreement. Pl. 56.1 at 33–34.

Plaintiff also alleges that "[o]n September 2, 2020, the defendants were notified by Mr. Morris that they were in breach of the 2007 publishing agreement for failure to render statement in over a two-year period" (the "September 2, 2020 Email"). *Id*. at 29. No copy of this email is included in the summary judgment materials, though Plaintiff includes an email on the same date from GPL attaching Plaintiff's royalty statements for 2018 and 2019. ECF No. 202-17. Plaintiff further states that her manager sent a December 30, 2020 cease and desist letter (the "December 30, 2020 Letter") and that her final dispute communication prior to the Complaint being filed was on February 11, 2021 (the "February 11, 2021 Communication"), Pl. 56.1 at 14, but these communications are not part of the summary judgment materials.

**LEGAL STANDARD**

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. When the movant properly supports her motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)).

"Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must construe that party's submissions 'liberally and interpret them to raise the strongest arguments that they suggest.'" *Taylor v. Quayyum*, No. 16-CV-1143 (GHW), 2023 WL 5293383, at *5 (S.D.N.Y. Aug. 17, 2023) (quoting *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999)). "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). "It is through this lens of leniency towards *pro se* litigants that this Court must

consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-2630 (NSM), 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020).

**DISCUSSION**

The Court first analyzes the incontestability provisions in the Agreements, holding that Plaintiff's first cause of action, relating to the 2007 Recording Agreement, is barred to the extent she did not timely send specific written objections and file a lawsuit. As to Plaintiff's third cause of action relating to the 2014 Co-Publishing Agreement, there is a genuine issue of material fact as to whether certain communications constitute specific written objections. The Court does not decide the issue of Plaintiff's second cause of action, relating to the 2007 Songwriter Agreement, because the parties did not brief whether English law applies. The Court next holds that Plaintiff's claim that Defendants improperly included recordings on albums released in 2008 and 2011 is time-barred, as is Plaintiff's claim that Defendants improperly registered musical compositions.

The Court then turns to Defendants request for leave to file a counterclaim, denying leave because it would prejudice Plaintiff. The Court denies Plaintiff's request for leave to amend her Third Amended Complaint, which was contingent upon the Court granting Defendants leave to amend, as moot. Finally, the Court denies Defendants' motion to strike Plaintiff's expert report and Plaintiff's letter that accompanied such.

**I.    Incontestability Clauses**

Each of the Agreements contains an incontestability clause that requires Plaintiff to have made a specific written objection to a royalty statement within two or three years of the statement. The 2007 Recording Agreement additionally requires that Plaintiff commence a suit within two years of the due date of the royalty statement. Courts in this district applying New

York law have uniformly enforced nearly identical incontestability clauses. *See, e.g.*, *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, No. 18-CV-9480 (CMK), 2019 WL 1950137, at \*11 (S.D.N.Y. Apr. 17, 2019) (internal citation omitted) (enforcing an incontestability provision that set forth the time period within which any objections arising from the agreement must be raised and a lawsuit must be commenced because courts enforce "a shortened statute of limitations when it is reasonable and agreed to by contract"); *Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*, No. 08-CV-6143 (DLC), 2011 WL 3874861, at \*3 (S.D.N.Y. Aug. 31, 2011) (holding that a three-year incontestability provision bars all objections to royalty statements not made within three years of the royalty statement); *Allman v. UMG Recordings*, 530 F. Supp. 2d 602, 605–06 (S.D.N.Y. 2008) (holding that a clause stating that all royalty statements were binding and not subject to objection "for any reason unless specific objection, in writing, stating the basis thereof, is given to [defendant] within two (2) years from the date rendered" was enforceable); *Franconero v. Universal Music Corp.*, No. 02-CV-1963 (RO), 2003 WL 22990060, at \*4 (S.D.N.Y. Dec. 19, 2003) (affirming enforcement of two-year incontestability clause and dismissing claims as time-barred to the extent they pre-dated the plaintiff's written objection by more than two years).

The 2007 Recording Agreement and 2014 Co-Publishing Agreement contain choice of law provisions selecting New York as the applicable law. 2007 Recording Agreement § 18.7; 2014 Co-Publishing Agreement § 16. The Court sees no reason, nor has Plaintiff provided one, why the Incontestability Clauses should not be enforceable for these two contracts under New York law. *See* ECF No. 204 ("Defs. Rep.") at 2–3; *see also Malmsteen v. Universal Music Grp., Inc.*, No. 10-CV-3955 (PAE), 2012 WL 2159281, at \*6 (S.D.N.Y. June 14, 2012) ("*Malmsteen I*") (internal citation and quotation marks omitted) ("Failure to conform to a contractual

limitations period will subject the action to dismissal, absent proof that the limitations provision was obtained through fraud, duress, or other wrongdoing.").

### A. Plaintiff's First Cause of Action Is Dismissed to the Extent Barred by the 2007 Recording Agreement Incontestability Clause

Plaintiff filed this action on January 7, 2022. ECF No. 1-1. Under the 2007 Recording Agreement Incontestability Clause, Plaintiff must submit any objections to royalty statements in writing within two years of the due date of the statement and must bring any action within the same time frame. 2007 Recording Agreement Incontestability Clause. Accordingly, Plaintiff is barred from challenging any royalty statement due prior to January 7, 2020, unless she submitted written objections and filed suit. The most recent statement from prior to January 7, 2020 is the VP 1H 2019 Statement, which covers the period from January to June 2019 and which was due on or before September 30, 2019. *See* ECF No. 170-2. The next royalty statement due under the 2007 Recording Agreement was the VP 2H 2019 Statement. *See* ECF No. 170-3.

Plaintiff does not challenge the reasonableness of a two-year contractual limitations period, but instead argues that (1) the royalty statements incorporate false expenses, Pl. 56.1 at 16; (2) the 2007 Recording Agreement does not apply to the master sound recordings in question, *id*. at 9; (3) Plaintiff did not sign up for the portal through which to receive royalty statements, *id*. at 12; and (4) she submitted written objections, *id*. at 13–14.

Plaintiff first argues that the royalty statements are "predicated on expenses that [have] been falsified from the inception of the agreement." *Id*. at 16–17. However, pursuant to the 2007 Recording Agreement Incontestability Clause, Plaintiff would have had to challenge the accuracy of the royalty statements within two years of their due dates and file suit relating to such. Objections raised after the two years are barred. *See 24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 566 F. Supp. 2d 305, 322 (S.D.N.Y. 2008) (stating that plaintiff waived its right to sue for certain

claims when it failed to specifically object in writing to the royalties or expenses pursuant to the parties' agreement). Thus, Plaintiff's first argument is exactly what the 2007 Recording Agreement Incontestability Clause prohibits.

Plaintiff next argues that certain titles from Strong One (I Am Not Afraid, Roots, Wrong Address, Jah Chariot, Live & Love Life, Nuclear, and Don't Forget) and from Free Expressions (Free, I Know You Love Me, Happy Heart, and Mocking Bird) are not governed by the 2007 Recording Agreement. Pl. 56.1 at 9–11, 18–19. For the reasons stated below in Section II, even without the 2007 Recording Agreement Incontestability Clause, any claims related to this alleged misconduct by Defendants are time-barred.

Third, Plaintiff argues that the 2007 Recording Agreement should not apply because the royalty statements were not sent to her in the manner set forth in the agreement. According to Plaintiff, Defendants attempted to send her the royalty statements through a portal for which she refused to sign up. Pl. 56.1 at 12; ECF No. 202-10. Plaintiff claims that she did not receive any royalty statements from Defendants after refusing to sign up for the portal. Pl. 56.1 at 12.

That Plaintiff refused to log into the portal and therefore did not receive the statements in the manner she requested does not save her claim. The 2007 Recording Agreement required her to file suit within "two (2) years from the date such statement of accounting for royalties or such payment was due." Plaintiff failed to do so.  Any claim by Plaintiff that "this works an inequitable result is unpersuasive. Courts routinely enforce contractual limitations and objection provisions, and [plaintiff] freely entered into those at issue here; he does not claim that the Agreement was the product of fraud or duress." *Malmsteen I*, 2012 WL 2159281, at *7–8 (holding that the incontestability provision applied even though plaintiff did not receive accounting statements); *see also Drum Major Music Ent. Inc. v. Young Money Ent., LLC*, No. 11-

CV-1980 (LBS), 2012 WL 423350, at *2 (S.D.N.Y. Feb. 7, 2012) (holding that contractual limitations period still applied when plaintiff did not receive royalties or an accounting, and when plaintiff's attorneys demanded the royalty payment or statement). That Plaintiff did not receive such statements does not excuse plaintiff from complying with the incontestability provision.

Finally, Plaintiff argues that she did in fact object on multiple occasions to the royalty statements. Pl. 56.1 at 13–14, 16, 25, 27. However, most of the objections she points to occurred more than two years before this suit was commenced on January 7, 2022. These alleged objections include the February 9, 2012 Letter, the October 6, 2015 Email, the February 14, 2017 Email, and the August 7, 2019 Email. Regardless of whether these communications constitute specific written objections under the 2007 Recording Agreement, any claims related to these objections would be barred under the terms of that agreement. *See Wechsler v. HSBC Bank USA, N.A*, No. 15-CV-5907 (JMF), 2016 WL 1688012, at *2 (S.D.N.Y. Apr. 26, 2016) (internal citation and quotation marks omitted) ("Under New York law, which the parties do not dispute applies to this action, courts will enforce a shortened statute of limitations when it is reasonable and agreed to by contract.").

There are several communications from Plaintiff that occurred within two years of this action. The Court does not decide whether the September 2, 2020 Email, the November 20, 2020 Email, the December 30, 2020 Letter, or the February 11, 2021 Communication constitute specific written objections. As discussed in Section I(B) below, that is an issue of fact for a jury to determine.

Instead, the Court turns to the impact of the 2007 Recording Agreement Incontestability Clause on the potentially remaining portion of Plaintiff's claim. Defendants argue that because

Plaintiff failed to timely challenge earlier statements, "all amounts appearing on royalty statements preceding the VP 2H 2019 Statement are 'binding' on Plaintiff and not subject to challenge if they appear on subsequent royalty statements or are the basis for amounts set forth on subsequent statements." Defs. Mem. at 14–15. The Court agrees. In the VP 2H 2019 Statement, the "previous period balance" is taken from and is the same number as the "ending balance" from the VP 1H 2019 Statement. *Id*. at 15; *see also* ECF No. 170-2; ECF No. 170-3. This "previous period balance" is therefore binding upon Plaintiff, and Plaintiff cannot challenge that portion of the royalty statement.

In *Malmsteen v. Universal Music Grp., Inc.* ("*Malmsteen II*"), defendant was also required to furnish a biannual royalty statement to plaintiff, which consistently showed a negative balance. 940 F. Supp. 2d 123, 133–34 (S.D.N.Y. 2013). Previously, the court had held that the plaintiff's claims were barred insofar as they were not made within the timeframe required by the parties' agreed upon incontestability provision. *See Malmsteen I*, 2012 WL 2159281, at *6–8. Accordingly, plaintiff "cannot now defeat the parties' contractual limitations provision by asserting a claim based on the negative balance carried forward from an allegedly improper deduction taken more than 15 years outside the limitations period." *Malmsteen II*, 940 F. Supp. 2d at 134. The same is true here: Plaintiff cannot pursue claims based upon the balance that was carried forward in the royalty statements and for which her claims would otherwise be barred under the 2007 Recording Agreement Incontestability Clause.

Accordingly, the Court concludes that Plaintiff's first cause of action is dismissed to the extent it is barred by the 2007 Recording Agreement Incontestability Clause.[1] Plaintiff's claims are barred insofar as they are based on any royalty statements before the VP 2H 2019 Statement.

### B. There Is a Genuine Issue of Material Fact as to Whether the 2014 Co-Publishing Agreement Incontestability Clause Bars Plaintiff's Third Cause of Action

Under the 2014 Co-Publishing Agreement Incontestability Clause, Plaintiff must submit any objections to royalty statements in writing within two years of the due date of the statement. 2014 Co-Publishing Agreement Incontestability Clause. Accordingly, Plaintiff is barred from challenging any royalty statement due prior to January 7, 2020, unless she submitted written objections. Plaintiff makes many of the same arguments regarding why the 2014 Co-Publishing Agreement Incontestability Clause does not apply as she did for the 2007 Recording Agreement Incontestability Clause. *See* Pl. 56.1 at 35–36. The Court adopts its analysis in Section I(A) above as to these arguments.

Next, the Court considers whether Plaintiff timely objected in writing to any royalty statements. Unlike the 2007 Recording Agreement, the 2014 Co-Publishing Agreement Incontestability Clause does not contain a provision regarding when Plaintiff would need to file a lawsuit. As such, for any alleged breach, Plaintiff needed to object to the relevant statement in writing within two years of its due date. Although Plaintiff references various emails and letters sent to Defendants, she does not attach all as exhibits in her opposition to the motion for summary judgment. Thus, the Court only considers the emails and letters that were submitted as exhibits along with Plaintiff's opposition: the February 9, 2012 Letter, October 6, 2015 Email,

---

[1] Plaintiff's argument that Defendants cannot move to dismiss part of a claim is based on Judge Woods' decision stating that a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) does not permit dismissals of parts of claims. *See* Pl. 56.1 at 2; ECF No. 123 at 11–13. However, parties may move for summary judgment on part of a claim. Fed. R. Civ. P. 56(a); *see also In re Methyl Tertiary Butyl Ether MTBE Prod. Liab. Litig.*, 824 F. Supp. 2d 524, 533 (S.D.N.Y. 2011).

February 14, 2017 Email, August 7, 2019 Email, and November 20, 2020 Email. Defendants claim that only the February 9, 2012 Letter and October 6, 2015 Email "arguably concern royalty accountings Greensleeves provided to Plaintiff under the 2007 Songwriter Agreement and the 2014 Co-Publishing Agreement from the inception of those agreements through June 30, 2018." Defs. Rep. at 9. First, Defendants argue that the February 9, 2012 Email is inadmissible as submitted, without providing any reasoning for why it is inadmissible. Second, Defendants argue, without citation to any case law, that neither of these communications constitutes "specific written objection" as required. *Id.* at 10.

A review of case law suggests that there is an issue of material fact as to whether any of the objections made constitute a "specific written objection" under the 2014 Co-Publishing Agreement Incontestability Clause. A non-exhaustive list of objections is as follows. In the February 9, 2012 Letter, Plaintiff writes "after reviewing the statements there are some discrepancies with regards to the mechanical rate and the cross collateralizing of the mechanical royalty applied. I look forward to discussing further the corrections of these issue pursuant to my agreement with Greensleeves Ltd." ECF No. 200-2. In the October 6, 2015 Email, Plaintiff included a screenshot of the royalty statement that covered the period January 1, 2014 through June 30, 2014 and asked how Greensleeves "manage[d] to add $4000." ECF No. 200-5 at 1–3. In the February 14, 2017 Email, Plaintiff's manager wrote, among other things, "I've never seen this statement before and would like to see a receipt or statement showing how you arrived at that balance, when was Etana paid and why does it seem there is a [cross-collateralization] of her royalty earnings?" ECF No. 200-6 at 1. In the August 7, 2019 Email, Plaintiff wrote that "I look forward to receiving the corrected statement for the I Rise album with the all rates on the page attached." ECF No. 200-7 at 1. And in the November 20, 2020 Email, Plaintiff's then-counsel

17

alleged that VP Records was incorrectly interpreting the Agreements and stated that "VP is no longer Etana's publisher and *therefore* any assignment of rights [is] invalid." ECF No. 202-18 at 2–3.

Although Defendants contend that these objections do not satisfy the requirement of the Incontestability Clauses, Defs. Rep. at 9–12, Defendants provide no reasoning as to why these emails do not constitute specific written objections. As courts have concluded in other cases, whether these emails constitute specific written objections is an issue of fact that would be inappropriate for the Court to determine on summary judgment. *See Allman v. UMG Recordings*, 530 F. Supp. 2d 602, 606 (S.D.N.Y. 2008); *see also Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, 598 F. Supp. 3d 158, 185–86 (S.D.N.Y. 2022) (denying summary judgment because there was a trial issue of fact regarding what the "specific written objection" requirement required). Accordingly, there is a genuine issue of material fact as to whether the communications that Plaintiff references constitute specific written objections within the meaning of the 2014 Co-Publishing Agreement Incontestability Clause.

Finally, Plaintiff argues that the 2014 Co-Publishing Agreement is invalid and unenforceable. Pl. 56.1 at 33–34. As such, the 2014 Co-Publishing Agreement Incontestability Clause would not apply, but neither would Plaintiff have a cause of action for breach of the 2014 Co-Publishing Agreement. If Plaintiff is suing regarding a breach of the 2014 Co-Publishing Agreement, she cannot in tandem argue that the 2014 Co-Publishing Agreement Incontestability Clause cannot be enforced because the full agreement is unenforceable. *See Est. of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.*, No. 14-CV-8751 (ER), 2015 WL 5660945, at *9 n.14 (S.D.N.Y. Sept. 25, 2015) (cleaned up) ("Plaintiff argues that the Court should not rely on a choice-of-law provision contained in an invalid mortgage. However, if the reverse mortgage

agreements are invalid, Plaintiff cannot simultaneously seek to enforce them through a breach of contract claim."). Accordingly, based on Plaintiff's claimed written objections, Defendants' motion for partial summary judgment on Plaintiff's third cause of action is denied.

### C.  The Court Has Insufficient Information to Determine the Effect of the 2007 Songwriter Agreement Incontestability Clause on the Second Cause of Action

The 2007 Songwriter Agreement states that it "shall be governed by the laws of England." 2007 Songwriter Agreement § 17. Contractual choice of law clauses apply to substantive issues, whereas New York law governs matters of procedure here. *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 214 (S.D.N.Y. 2006). Thus, the Court must determine whether incontestability provisions are substantive or procedural under New York law. Although "[s]tatutes of [l]imitation are generally considered procedural" in a choice of law context, the New York Court of Appeals has held that that is not always the case. *See Tanges v. Heidelberg N. Am., Inc.,* 687 N.Y.S.2d 604, 607 (1999). Defendants have not briefed whether incontestability provisions are procedural or substantive and why, as appears to be their position, English law does not apply. If Defendants concede English law does apply, they have not briefed cases decided under English law regarding whether incontestability provisions are enforceable.

Accordingly, the Court denies without prejudice Defendants' motion for summary judgment regarding the 2007 Songwriter Agreement. *See FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.*, 754 F. Supp. 2d 628, 637 (S.D.N.Y. 2010) (denying motion to dismiss without prejudice to renewing the motion and briefing the issue of English law when the parties did not previously brief the issue); *Gil v. Pizzarotti, LLC*, No. 19-CV-3497 (MKV), 2021 WL 1178027, at *13 (S.D.N.Y. Mar. 29, 2021) (denying summary judgment when defendants did not brief an issue because "as the moving party, they have necessarily failed to meet their burden and therefore cannot be entitled to summary judgment").

II.    **Plaintiff's Claim that Defendants Improperly Included Recordings on Albums Released in 2008 and 2011 Is Time-Barred**

Defendants also move for summary judgment on Plaintiff's claim that Defendants breached Sections 3.1 through 4.4 of the 2007 Recording Agreement by improperly producing certain song recordings, arguing that the claim is time-barred. Def. Mem. at 20–21; *see also* ECF No. 103 ("Third Amended Complaint" or "TAC") ¶ 106. Under New York law, the statute of limitations for breach of contract actions is six years. N.Y. C.P.L.R. § 213(2) ("The following actions must be commenced within six years . . . an action upon a contractual obligation or liability, express or implied . . . ."). The period begins to run when a breach occurs. *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 125 (2d Cir. 2019). It is undisputed that The Strong One was released on June 17, 2008. Def. Mem. at 21; TAC ¶ 58. Plaintiff alleges that Free Expressions was released on December 16, 2010 and made available worldwide by February 8, 2011, while Defendants state that Free Expressions was released on February 8, 2011. Def. Mem. at 21; TAC ¶ 61. Accordingly, at the latest, Plaintiff must have filed this component of her claim by June 17, 2014 for the Strong One and February 8, 2017 for Free Expressions. *See Lehman XS Tr.*, 916 F.3d at 125 (affirming grant of summary judgment for defendant when actions were filed over six years after the statute of limitations for the breach of contract actions began running). She failed to do so. As such, the portion of Plaintiff's first cause of action that VP Music breached the 2007 Recording Agreement by improperly including certain recordings on The Strong One and Free Expressions is hereby dismissed.

III.    **Plaintiff's Claim that Defendants Improperly Registered Musical Compositions Is Partially Time-Barred**

Defendants finally move for summary judgment on Plaintiff's claim that GPL breached Section 23 of the 2007 Songwriter Agreement by failing to "properly register ownership of all

Compositions jointly owned by Plaintiff and Defendants in the Defendants' and Plaintiff's name." Def Mem. at 22; TAC ¶ 124. Although Defendants rely on New York's statute of limitations, as discussed above in Section I(C), the 2007 Songwriter Agreement is governed by English law, and Defendants did not brief the choice of law issue. Thus, the Court denies without prejudice Defendants' motion for summary judgment regarding the 2007 Songwriter Agreement and Plaintiff's second cause of action remains in full.

## IV.    Leave to File a Counterclaim Is Denied, as Is Leave to Amend the Third Amended Complaint

Defendants request leave to file a counterclaim under the Digital Millennium Copyright Act ("DMCA"). *See* ECF No. 213 at 2; ECF No. 232 at 4. Defendants allege that Plaintiff sent improper takedown notices to Spotify, in contravention of Judge Woods' opinion dismissing Plaintiff's copyright claim. ECF No. 232 at 4. Defendants further allege that "[b]ecause Plaintiff knew the Court had dismissed her copyright claim – which included works that were the subject of her takedown notices – she is subject to liability under 17 U.S.C. § 512(f) of the DMCA." *Id*. at 4–5. In turn, Plaintiff requests leave to submit claims "[s]hould the court decide to grant the defendants' requests" to file counterclaims. ECF No. 219 at 1; *see also id*. at 3 ("The plaintiff understand[s] that the inclusion of these additional claims is contingent upon the court granting the defendants the right to file a counter suit."). Plaintiff's claims are "based on newly discovered evidence arising from the handwriting expert discovery report and the Defendants' removal of the 'I Rise' album from Spotify." *Id*. She seeks to reintroduce a fraud claim as well as add claims for conversion, unjust enrichment, negligent misrepresentation, tortious interference, punitive damages, and account stated. *Id*. at 2–3.

Whether to grant or deny leave to amend is "within the sound discretion of the trial court." *Bay Harbour Mgmt., LLC v. Carothers*, 474 F. Supp. 2d 501, 502 (S.D.N.Y. 2007) (citing

*Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990)). Leave to amend shall be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has instructed, however, that leave may be properly denied for: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In evaluating prejudice, courts consider "whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (internal citation and quotation marks omitted).

At this late stage, allowing Defendants to add a counterclaim would cause a significant delay in the litigation. This matter has been pending since early 2022, fact discovery has been complete since March 2024, expert discovery is – as discussed below in Section V – nearly complete, and the Court has decided Defendants' motion for partial summary judgment in this opinion. The operative case management plan and scheduling order was implemented on October 5, 2023 and stated that "[n]o further amendments are allowed except with leave of the Court." ECF No. 150 at 2.

Were leave to amend granted, discovery would have to be reopened. Although at the April 18, 2024 conference Defendants stated that they did not anticipate needing to depose anyone, Plaintiff stated that she would take two depositions. And certainly, third-party and other discovery would need to be taken. Allowing the proposed amendment would burden Plaintiff with additional expenses in participating in and seeking additional discovery, and would delay resolution of the case. And even if the burden is minimal, "any prejudice is unwarranted given

the procedural history of this action." *Dervan v. Gordian Grp. LLC*, No. 16-CV-1694 (AJN), 2018 WL 4278287, at *2 (S.D.N.Y. June 20, 2018). Moreover, nothing prevents Defendants from filing a separate action. Although Judge Woods' prior decision in this case would be relevant to that action, the facts relating to the proposed counterclaims are separate from those underlying this action. Leave to amend is therefore denied.

Because Plaintiff's request to amend her Third Amended Complaint was contingent upon the Court granting Defendants leave to amend, Plaintiff's request for leave to amend is denied as moot.

## V.    The Motion to Strike Plaintiff's May 23, 2024 Letter and Expert Report Is Denied

Finally, the Court turns to Defendants' motion to strike Plaintiff's May 23, 2024 letter (the "May 23 Letter") and Plaintiff's expert report. *See* ECF No. 229; ECF No. 236. The Court sees no basis to strike the May 23 Letter at this point. As the Court has already noted for the parties, "[p]ursuant to Local Rule 5.1, the parties need only file discovery materials that are the subject [of] or cited in a motion or application." ECF No. 231. The Court does not consider the May 23 Letter to be a supplemental submission to the summary judgment motion, for which the parties were ordered not to file any additional responses as of January 29, 2024. ECF No. 210.

Regarding Plaintiff's expert report, the Court understands that Plaintiff sent the expert report via FedEx to the *Pro Se* Intake Unit on both May 6, 2024 and May 10, 2024, but the *Pro Se* Intake Unit did not file it. *See* ECF No. 230. Due to this, Plaintiff sought assistance to upload the report herself to ECF. *Id*. The Court sees no evidence of gamesmanship or egregious conduct by Plaintiff. The Court denies Defendants' motion to exclude the expert report, without prejudice. Defendant may serve a rebuttal to Plaintiff's expert report on or before **October 18, 2024**. The close of expert discovery is extended to **November 8, 2024**.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part. The Court GRANTS Defendants' motion as to Plaintiff's first cause of action, relating to the 2007 Recording Agreement, because it is barred to the extent Plaintiff did not timely send specific written objections and file a lawsuit. Additionally, the Court GRANTS Defendants' motion as to Plaintiff's claim that Defendants improperly included recordings on albums released in 2008 and 2011 and Plaintiff's claim that Defendants improperly registered musical compositions, because those claims are time-barred. However, the Court DENIES Defendants' motion as to Plaintiff's third cause of action relating to the 2014 Co-Publishing Agreement, because there is a genuine issue of material fact as to whether certain communications constitute specific written objections. Defendants' motion is also DENIED without prejudice as to Plaintiff's second cause of action, relating to the 2007 Songwriter Agreement, because it concerns issues that may be based in English law that Defendants have not briefed. The Court also DENIES Defendants' motion to amend their answer to add counterclaims because of the prejudice Plaintiff would face and DENIES Plaintiff's motion to amend her Third Amended Complaint as moot. Finally, the Court DENIES Defendants' motion to exclude Plaintiff's expert handwriting report, but GRANTS Defendants' motion to file a rebuttal expert report.

Defendants may serve a rebuttal to Plaintiff's expert report on or before **October 18, 2024**. The close of expert discovery is extended to **November 8, 2024**. By **November 22, 2024**, Plaintiff and counsel for Defendants must meet for at least one hour to discuss settlement and file a joint letter updating the Court on the status of the case, including but not limited to, confirming that the one-hour settlement discussion occurred and stating whether all parties consent to

mediation or a settlement conference to be held before the designated Magistrate Judge. All

parties shall appear for a conference with the Court on **November 26, 2024** at **12:00 p.m.** in

Courtroom 11B of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New

York, New York. The Clerk of Court is directed to terminate ECF Nos. 168 and 236.

Dated:  September 27, 2024
        New York, New York

                                            SO ORDERED.

                                            _Jessica Clarke_

                                            JESSICA G. L. CLARKE
                                            United States District Judge